[659 NYS2d 659]

In the Matter of the Arbitration between TELESERVE SYSTEMS, INC., Appellant, and MCI TELECOMMUNICATIONS CORPORATION et al., Respondents.

Fourth Department, May 30, 1997

APPEARANCES OF COUNSEL

*Edward A. O'Hara, III,* Syracuse, for appellant.

*Proskauer Rose Goetz & Mendelsohn, L. L. P.,* Washington, D.C. *(Christopher Wolf* of counsel), for respondents.

## OPINION OF THE COURT

DENMAN, P. J.

■■ This appeal requires us to decide whether the various challenges by petitioner to arbitration clauses contained in agreements between petitioner and respondents should be determined by Supreme Court or by the arbitrator. We are also presented with the novel question whether a $204,000 arbitration filing fee required by those clauses is unconscionable and against public policy and thus unenforceable. We conclude that the challenges to the arbitration clauses are for the court to determine and that, as a matter of law, the filing

fee is so excessive as to be unenforceable. We decline to pass on the remainder of petitioner's challenges to the arbitration clauses because they present questions of fact that must be determined by the court.

## I

In July 1993 petitioner, Teleserve Systems, Inc., a company located in Syracuse, entered into an agreement with respondent MCI Telecommunications Corporation (MCI) (conducting business as SouthernNet, Inc.). By its terms, and as modified in April 1994, the July 1993 agreement called for petitioner to serve as agent in the marketing of operator services and long distance termination services to be provided by MCI. Upon entering into that agreement, petitioner expended considerable capital assembling an internal sales force, administrative and support staff, and Fielding a nationwide network of sales agents, some of which, in turn, fielded their own sales agents. Within that structure, petitioner marketed MCI's services and procured new customers for MCI. The April 1994 agreement, like the July 1993 agreement, contained a "Controlling Law/ Disputes" clause providing that questions regarding the validity, construction, performance, and enforcement of the agreement would be governed by the laws of New York and that "[a]ll disputes arising under this Agreement shall be submitted to arbitration in accordance with the Commercial Arbitration rules of the American Arbitration Association [AAA]."

By letter dated August 15, 1994, petitioner raised numerous complaints concerning MCI's difficulties in managing the volume of new business procured by petitioner and its subagents. Petitioner complained that MCI's service failures were prompting customers to switch to other carriers, resulting in a loss of commissions and severe financial distress to petitioner and its subagents. In subsequent communications, petitioner complained that MCI had failed to credit and pay commissions in a timely manner; that petitioner had spent one year and $1,300,000 building a sales network to market MCI's services; and that, as a result, petitioner had exhausted its capital, was $300,000 in debt, was losing money at the rate of $30,000 per month, and was under intense pressure from creditors.

At the conclusion of a meeting on September 13, 1994, petitioner believed that it had reached an agreement in principle with MCI whereby MCI would make settlement payments of $300,000 plus $30,000 per month pending correction of the service problems. In reliance on MCI's assurances,

petitioner promised its creditors that they would be paid within a few weeks. In fact, petitioner did not immediately receive payment from MCI and negotiations continued over the next two months. Although petitioner needed the settlement payments as soon as possible in order to satisfy its creditors, MCI evidently desired to disguise the form of the settlement payments in order to conceal them from other agents with whom it also was involved in disputes. Consequently, MCI asked petitioner to prepare an outline of financial terms—such as percentage adjustments—required to implement the September 13 settlement, which was to take the form of new agency agreements. Petitioner immediately prepared such outline. Nonetheless, for two months MCI continued to put off final approval of the settlement, the drafting of new agreements, and payment of the settlement to petitioner, while repeatedly promising that the settlement would be finalized within days.

Between late September and early November 1994, petitioner continually expressed concern over MCI's delays. Petitioner informed MCI that petitioner was in severe financial straits, that its employees' health insurance had been canceled, that it was borrowing to meet payroll, and that it was under intense pressure from creditors, including Federal and State taxing authorities, some of which were threatening to force petitioner into bankruptcy. Nonetheless, MCI continued to delay drafting new agreements and making the promised settlement payment. Petitioner alleges that MCI's delay was a scheme to exploit petitioner's desperation in order to extract other concessions in the negotiation of new agreements.

MCI finally delivered the proposed new agreements to petitioner until November 17, 1994. Those agreements named petitioner as agent for the sale of operator services and long distance termination services to be provided by MCI and its subsidiary, Teleconnect Long Distance Services and Systems Company (collectively respondents or MCI). The new agreements were not accompanied by the promised payment. Further, upon review of the proposed agreements, petitioner discovered that respondents had unilaterally inserted new arbitration provisions in place of those contained in the former agreements. The new agreements provided in pertinent part:

"Any dispute arising out of or related to this Agreement, which cannot be resolved by negotiation, shall be settled by binding arbitration in accordance with the rules contained in [MCI or Telecom] Tariff FCC No. 1 ('Arbitration Rules') * * *

"Either [party] may initiate arbitration by providing written demand for arbitration, a copy of this Agreement, and the

administrative fee required by the Arbitration Rules to the Endispute office located in Washington, D.C."

Although the MCI Tariff is incorporated by reference into the arbitration agreements, it is allegedly unpublished and apparently was not physically made part of the new agreements. It is not clear whether the MCI Tariff was furnished to petitioner prior to this proceeding. Further, while petitioner apparently has abandoned the contention that the MCI Tariff is inapplicable to disputes arising under the parties' agency agreements, we note that, by its terms, the MCI Tariff applies only to disputes between respondents and their telephone service customers.

The issue of applicability aside, petitioner complains that the arbitration clauses in the new agreements are so favorable to MCI that they are unconscionable. Whereas the former agreements allowed petitioner to commence arbitration before the AAA in Syracuse, the new agreements require it to commence arbitration before Endispute in Washington, D.C. The new agreements do not permit petitioner to participate in selecting the arbitrator, to recoup attorneys' fees and costs, or to recover punitive damages. Most significantly, whereas the AAA requires a flat filing fee of $4,000, the new agreements, by incorporating the MCI Tariff, require a filing fee of $4,000 plus .5% of the amount claimed. Petitioner would thus be required to pay a filing fee of $204,000 based on its present claim, which seeks $40,000,000 in compensatory damages.

Upon reviewing the new agreements, petitioner immediately protested that the new provision was "never discussed—much less agreed upon" by the parties. Petitioner informed MCI that, as a result of the prolonged delay, petitioner had lost all credibility with its creditors, that its bank had declared it in default on a note, and that the telephone company was threatening to cut off petitioner's service the next day. Petitioner nonetheless stated that, "at this point we have no option but to sign the contracts as presented!!" Petitioner signed the agreements that day and returned them to MCI by overnight mail. Although MCI had promised to remit the $300,000 payment as soon as the agreements were signed, it did not send a check until December 7, 1994.

Petitioner continued to market MCI's services pursuant to the new agreements. Problems persisted with MCI's provision of services to customers recruited by petitioner and its subagents, and in connection with MCI's crediting and payment of commissions to petitioner. By August 1995, petitioner

had spent over $2,400,000 in carrying out its obligations under the agreements, and its subagents had invested an additional $2,000,000. By that point, petitioner had exhausted its capital and "closed its doors". Petitioner served a notice of default upon MCI and thereafter filed a notice of claim for breach of contract with Endispute. Petitioner sought to recover its investment and that of its subagents, as well as lost profits, for total compensatory damages of $40,000,000. In response, MCI asserted that petitioner's claim was improperly commenced, and that Endispute had no jurisdiction over the claim, because petitioner had failed to pay the required filing fee.

## II

Petitioner instituted this proceeding, which is a hybrid of a proceeding to compel arbitration pursuant to CPLR article 75 and a suit in equity to rescind or reform the arbitration clauses of the agency agreements. Petitioner alleges that the arbitration clauses are unconscionable on their face, especially with respect to the filing fee, and were procured by MCI's overreaching, unconscionable conduct, and economic coercion. Petitioner asked the court to delete the clauses in their entirety and replace them with the arbitration clauses contained in the parties' former agreements, then direct the parties to arbitrate before the AAA. Alternatively, petitioner asked the court to delete the clauses and direct the parties to proceed to arbitration before an arbitrator appointed by the court pursuant to CPLR article 75.

Prior to answering, respondents moved, pursuant to CPLR 7503 (a), for an order "staying this litigation and compelling arbitration based on clear and unambiguous arbitration provisions." Alternatively, respondents sought an order dismissing the petition for failure to state a cause of action or converting the proceeding to a plenary action.

In response to that motion, petitioner moved for summary judgment, which respondents opposed on the grounds that a summary judgment motion was premature and that respondents needed to engage in discovery in order to respond to the motion.

The court granted respondents' motion for a stay of the proceeding pursuant to CPLR 7503 (a). Petitioner appeals, contending that the court erred in apparently concluding that it had no authority to consider petitioner's challenges to the arbitration clauses and in referring the issues of unconscionability and duress to the arbitrator.

## III

■ Petitioner's challenges to the arbitration clauses, which seek reformation on the grounds of unconscionability and duress, are for the court to determine. There is some uncertainty whether the issues of arbitrability are governed by Federal or State law. The agreements involve a transaction in interstate commerce, thus making the arbitration clauses subject to the Federal Arbitration Act (see, 9 USC §§ 1, 2; *Southland Corp. v Keating*, 465 US 1, 14-15; *GAF Corp. v Werner*, 66 NY2d 97, 102). On the other hand, the parties expressly agreed that all matters relating to the validity, construction, performance, and enforcement of the agreements would be governed by the laws of New York, although they did not specify whether CPLR article 75 would govern. The Supreme Court has spoken inconsistently on the question whether a contractual choice-of-law provision overrides application of the Federal Arbitration Act according to its terms (*compare, Voit Information Sciences v Leland Stanford Jr. Univ.*, 489 US 468, 474-479, *with Moses H. Cone Hosp. v Mercury Constr. Corp.*, 460 US 1, 24-25). We need not resolve the potential conflict, however, because Federal and State law are in harmony concerning the court's power and duty to determine challenges to the validity of an agreement to arbitrate.

CPLR 7503 (a) provides in pertinent part: "A party aggrieved by the failure of another to arbitrate may apply for an order compelling arbitration. Where there is no substantial question whether a valid agreement was made * * * the court shall direct the parties to arbitrate. Where any such question is raised, it shall be tried forthwith in said court." Similarly, the Federal Arbitration Act, specifically 9 USC § 2, provides in pertinent part: "[A] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 USC § 4 provides in pertinent part: "A party aggrieved by the alleged failure * * * of another to arbitrate under a written agreement for arbitration may petition * * * [the] court * * * for an order directing that such arbitration proceed * * * The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration * * * is not in issue, the court shall make an order directing the parties to proceed to arbitration * * * If the making of the arbitration agreement * * * be

in issue, the court shall proceed summarily to the trial thereof."

It is well established under both CPLR 7503 and 9 USC § 4 that a party may resist enforcement of an agreement to arbitrate on any basis that could provide a defense to or grounds for the revocation of any contract, including fraud, unconscionability, duress, overreaching conduct, violation of public policy, or lack of contractual capacity (*see generally, Mitsubishi Motors v Soler Chrysler-Plymouth*, 473 US 614, 626, 632; *Southland Corp. v Keating, supra*, at 16, n 11; *Sablosky v Gordon Co.*, 73 NY2d 133, 138-139; *Matter of Prinze [Jonas]*, 38 NY2d 570, 577). Nonetheless, although the statutes use similar language concerning the making of an arbitration agreement and the duty of the court to try any issue of contractual validity, there appears to be some difference in the manner in which the statutes have been interpreted. In interpreting the Federal statute, the Federal courts have recognized a distinction not wholly adopted by the New York courts in their interpretation of the New York statute. Under Federal law, if the challenge is aimed at the making of the contract as a whole, that challenge is for the arbitrator, not the court, to determine (*see, Prima Paint v Flood & Conklin*, 388 US 395, 403-404; *Lawrence Co. v Devonshire Fabrics*, 271 F2d 402, 410-411, cert dismissed 364 US 801; *see also, GAF Corp. v Werner, supra*, at 102, n 2 [construing Federal law]; *Dolomite, S.p.A. v Beconta, Inc.*, 129 Misc 2d 857, 859 [same]). Conversely, where the challenge is to the making of the arbitration clause itself, or to its inclusion in the contract, the challenge is for the court to decide (*see, Prima Paint v Flood & Conklin, supra*, at 403-404; *Moseley v Electronic Facilities*, 374 US 167, 171; *Lawrence Co. v Devonshire Fabrics, supra*, at 410-411; *see also, GAF Corp. v Werner, supra*, at 102, n 2). Under CPLR article 75, in contrast, the court must decide the challenge where it is to the validity of the arbitration clause itself, or where the alleged illegality permeates the contract as a whole (*see, Matter of Silverman [Benmor Coats]*, 61 NY2d 299, 307-308; *Matter of Prinze [Jonas], supra*, at 577; *Matter of Weinrott [Carp]*, 32 NY2d 190; *Housekeeper v Lourie*, 39 AD2d 280, 283-285, appeal dismissed 32 NY2d 832; *Dolomite, S.p.A. v Beconta, Inc., supra*, at 859).

Again, we need not concern ourselves with the apparent conflict because, under either Federal or New York law, to the extent that petitioner challenges the arbitration clauses themselves or their inclusion in the agreements, those challenges are for the court to determine (*see, Prima Paint v Flood*

& *Conklin, supra,* at 403-404; *Moseley v Electronic Facilities, supra,* at 171; *Lawrence Co. v Devonshire Fabrics, supra,* at 410-411; *Matter of Silverman [Benmor Coats], supra,* at 307-308; *Housekeeper v Lourie, supra,* at 283-285; *Dolomite, S.p.A. v Beconta, Inc., supra,* at 859).

The parties agree in their reading of the Federal and State cases, and differ only with respect to whether petitioner is challenging the making of the arbitration clauses themselves or the agreements as a whole. There is no merit to MCI's contention that petitioner is challenging the validity of the agreements as a whole. The petition seeks reformation of the "MCI Arbitration Clauses" on the grounds that they are "completely advantageous to MCI, and completely disadvantageous to" petitioner. Petitioner claims that "respondent[s] secured the MCI arbitration clauses under such patently coercive circumstances as to constitute 'gross overreaching' * * * 'bad faith' " and "economic duress". The petition seeks an order directing the parties to arbitrate pursuant to such "reformed" arbitration clauses. Further, petitioner's underlying claim alleges that MCI breached a series of agency agreements, among them the November 17, 1994 agreements containing the objectionable arbitration clauses. The claim therefore depends on the validity of those agreements and cannot be construed as a challenge to the agreements as a whole. Under both Federal and State law, the challenges to the making of the arbitration clauses are for the court to determine. Thus, Supreme Court erred in granting MCI's motion to stay the proceeding.

## IV

Turning to the substance of the challenges to the arbitration clauses, we conclude that, as a matter of law, the filing fee requirement is unreasonable, unjust, and unconscionable on its face and may not be enforced. As an initial matter, there is no merit to MCI's contention that petitioner has erroneously calculated the size of the filing fee based on an improper demand for punitive damages. Also lacking in merit is MCI's contention that the filing fee is not imposed by the MCI Tariff, but by Endispute. Those assertions are conclusively refuted by the express terms of the MCI Tariff, which imposes a filing fee of $4,000 plus .5% of the amount claimed. The MCI Tariff thus requires petitioner to pay a filing fee of $204,000 based on its claim for approximately $40,000,000 in compensatory damages.

That filing fee is patently excessive and bears no reasonable relation to the arbitration forum's administrative expenses in processing the claim. A filing fee of $204,000 far exceeds fees typically charged by neutral arbitration forums. The practical effect of such an oppressive and burdensome fee is to bar arbitration of petitioner's claims against MCI. The fee thus is against public policy, which favors and encourages arbitration as an alternative to litigation (*see, Mobil Oil Indonesia v Asamera Oil*, 43 NY2d 276, 281-282, *rearg denied* 43 NY2d 846; *Matter of Weinrott [Carp], supra*, at 199). Further, the onerous filing fee requirement renders the contractual remedy of arbitration so " 'gravely difficult and inconvenient' " as to be illusory (*Mitsubishi Motors v Soler Chrysler-Plymouth, supra*, at 632, quoting *The Bremen v Zapata Off-Shore Co.*, 407 US 1, 18). We thus grant the petition in part, to the extent of striking the filing fee requirement from the agreements on the ground that it is unconscionable on its face and as a matter of law (*cf., Spence v Omnibus Indus.*, 44 Cal App 3d 970, 119 Cal Rptr 171 [4th Dist] [holding $720 arbitration filing fee unenforceable], cited with approval by *Waggoner v Dallaire*, 649 F2d 1362, 1367 [9th Cir]).

## V

Petitioner seeks to reform or rescind other provisions of the arbitration clauses on the grounds that they are unconscionable or were wrongfully procured through overreaching and economic duress. Those challenges cannot be resolved on this record, which contains only petitioner's account of the events leading up to the execution of the new agreements. Respondents must be given the opportunity to answer the petition and to refute petitioner's version of events. Because the challenges are to the making of the arbitration clauses themselves or to their inclusion in the agreements, as opposed to the validity of the agreements as a whole, those challenges are for the court to determine, by trial if necessary.

Accordingly, the order should be reversed and the petition should be granted to the extent of striking the filing fee requirement of the arbitration clauses on the ground that it is unconscionable on its face and as a matter of law.

GREEN, LAWTON, BALIO and FALLON, JJ., concur.

Order unanimously reversed, on the law, with costs, and petition granted in part, in accordance with the opinion by DENMAN, P. J.