**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a Delaware Corporation, Plaintiff,**

v.

**James W. COE, John D. Wade, Robert L. Harmon, Joann Harmon, and ORA Robertson, Jr., Defendants.**

No. CIV.A. 1:03–0388.

United States District Court, S.D. West Virginia, At Bluefield.

April 9, 2004.

Terry R. Weiss, Brian C. Hale, Sutherland, Asbill & Brennan, Atlanta, GA, Richard L. Gottlieb, Webster J. Arceneaux, III, Lewis, Glasser, Casey & Rollins, Charleston, WV, for Plaintiff.

Stephen B. Farmer, Robert A. Campbell, James R. Fox, Christopher S. Arnold, Farmer, Cline & Arnold, Charleston, WV, Shawn P. George, George & Lorensen, Charleston, WV, for Defendants.

## MEMORANDUM OPINION IN SUPPORT OF ORDER DIRECTING ARBITRATION OF STATE COURT CLAIMS

FABER, Chief Judge.

### I. Introduction

Before the court is Merrill Lynch, Pierce, Fenner & Smith, Inc.'s ("Merrill Lynch") motion for an order directing arbitration, sought in accordance with § 4 of the Federal Arbitration Act. *See* 9 U.S.C. § 4. The defendants in this matter, James Coe, John Wade, Robert and Joann Harmon, and Ora Robertson, Jr. ("state court plaintiffs") are plaintiffs in various proceedings pending in the Circuit Court of McDowell County, West Virginia ("state court actions"). Pursuant to § 4 the court conducted a hearing on January 6, 2004, and determined that the making of an agreement to arbitrate was "in issue." The court accordingly conducted a bench trial on February 27, 2004, in Charleston, West Virginia. At this trial, the parties presented evidence concerning the alleged arbitration agreements and any defenses applicable to them. The court has concluded that it must order the state court plaintiffs to arbitrate the claims being litigated in the state court actions and has accordingly issued Findings of Fact and Conclusions of Law in support of its ruling. This memorandum opinion details the court's legal and factual findings and discusses the critical issue in this case, whether West Virginia public policy prohibits enforcement of the arbitration agreements at issue here.[1]

---

1. For further factual and legal analysis, see the court's Findings of Fact and Conclusions of Law in Support of Order Directing Arbitration of State Court Claims (Doc. No. 109).

## II. Factual Background

Between 1994 and 2000, each state court plaintiff opened an account or accounts with Merrill Lynch. In the course of opening these accounts, each state court plaintiff executed preprinted, form agreements with Merrill Lynch that (among other things) provided that New York law would govern their interpretation and validity and that all claims would be submitted to binding arbitration. The portions of the agreements setting forth these terms were clearly and unambiguously written and labeled; however, neither the forms nor Merrill Lynch's agents specifically alerted the state court plaintiffs to the existence of the terms or required the state court plaintiffs to separately and specifically assent to them. At the time they signed the agreements, each state court plaintiff was able to read and understand the English language and was competent to contract on his or her own behalf.

After executing the relevant agreements, each state court plaintiff transferred sums to Merrill Lynch for investment pursuant thereto. Merrill Lynch accepted the sums and invested them. Subsequently, the accounts of each state court plaintiff suffered significant losses. As a result, the state court plaintiffs commenced the state court actions in West Virginia circuit court against Merrill Lynch and its agents and employees. Each state court action seeks relief from Merrill Lynch and/or Merrill Lynch's agents and employees on account of the actions of Merrill Lynch and its agents and employees. One suit (prosecuted by Ora Robertson, Jr.) seeks relief only from Merrill Lynch's agent, but the suit seeks this relief on account of the agent's conduct on behalf of Merrill Lynch. The court previously ruled that Merrill Lynch was an "aggrieved party" with standing to seek relief from Robertson. *See* Order Setting Hearing and Addressing Various Pretrial Matters (Doc. No. 44), at 9–10. The state court actions seek punitive and compensatory damages in an amount in excess of $75,000. The state court actions set forth causes of action for: (1) negligence; (2) breach of contract; (3) breach of fiduciary duty; and (4) common-law fraud and violation of W. Va.Code § 32–4–410.

The arbitration and choice-of-law clauses at issue all employ similar language. For example, the arbitration clause in the agreement executed by Robert and Joann Harmon on January 21, 1995, generally provides: "I agree that all controversies which may arise between us, including but not limited to those involving any transaction or the construction, performance, or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration." The clause designates several forums for arbitration, including the National Association of Securities Dealers (NASD). The same agreement provides that it is to be "governed and interpreted under the laws of the State of New York." While there are differences in the precise language employed in the various agreements executed by the state court plaintiffs, each agreement stipulates arbitral resolution through a forum such as the NASD and provides that New York law applies. Each agreement was executed within the geographic confines of the State of West Virginia and was intended to be performed for the benefit of West Virginia citizens.

At trial, the parties presented extensive evidence on the differences between arbitration before the NASD and litigation in a West Virginia state court. First and most obviously, NASD arbitration takes place before a panel of three arbitrators, rather than before a judge and a jury. Parties have the power to object to and strike

particular arbitrators, but the decision of the final panel is binding. Second, the cost of filing an NASD arbitration is significantly greater than the cost of filing an action in a West Virginia circuit court. For example, the filing fee for a claim between $100,000 and $500,000 is $1,425, while the cost of filing an action in the circuit court is $125. At the same time, testimony established that NASD arbitration tends to be less expensive than litigation in state court, though this tendency is only a general one.

A third difference is that litigants have much more limited discovery rights in NASD arbitration than they do in litigation before a West Virginia trial court. Depositions are not available as a matter of right in NASD arbitration, and NASD arbitrators have only a limited power to compel the attendance of persons, particularly persons who are not registered with the NASD or employed by a registered person or entity. Although NASD discovery rules apply equally to consumers (like the state court plaintiffs) and industry participants (like Merrill Lynch), it is noteworthy that different, more liberal rules apply to disputes that are solely between industry persons.

Fourth, NASD arbitration generally entails less motion practice and is less likely to involve an appeal than is a jury trial before a West Virginia circuit court. Fifth and finally, parties to NASD arbitration have more flexibility as to the timing and scheduling of their proceedings than do state court litigants. However, participants to NASD arbitration may need to travel further than would litigants in state court. The state court plaintiffs would likely be required to travel to Ohio in order to prosecute their claims.

### III. Discussion

The court finds jurisdiction proper pursuant to the diversity statute, 28 U.S.C.

§ 1332. The arbitration agreements at issue here concern "commerce" as that term is defined by the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. § 1. Finally, the Act is itself a proper exercise of Congress's power to regulate commerce among the several states and with foreign nations.

### a. Federal Arbitration Act

■ The Federal Arbitration Act allows a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to petition a federal district court for "an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The court must enter such an order if it determines that a written agreement to arbitrate was "made" and that the defendant has refused to comply with it. See id.; see also Sydnor v. Conseco Fin. Servicing Corp., 252 F.3d 302, 305 (4th Cir.2001) ("if parties execute a valid agreement to arbitrate disputes, a federal court must compel arbitration"). The Act also provides that any agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The federal courts have developed and applied a "severability doctrine" under which challenges to an arbitration clause itself are heard by the court considering the FAA claim, whereas challenges to the contract as a whole are referred to the arbitrator. See Snowden v. CheckPoint Check Cashing, 290 F.3d 631, 637 (4th Cir.2002). This court can only consider challenges that "specifically relate" to the arbitration clause, instead of to the agreement generally. See id. A challenge specifically relates to an arbitration clause if it would invalidate that clause while leaving the remainder of the contract intact. See Sydnor, 252 F.3d at 307.

■ The court must order a party to arbitrate if it finds that the party made at least one valid agreement to arbitrate that applies to the present dispute. For example, in *Snowden v. CheckPoint Check Cashing*, the Court of Appeals for the Fourth Circuit ordered a plaintiff to arbitrate her claims against a check-cashing company. *Snowden*, 290 F.3d at 639. The plaintiff had signed twelve separate agreements with the company during an eight-month period, and one of the agreements (from the middle of the period) contained an arbitration clause. *See id.* at 633. This clause provided for the arbitration of "*[a]ny* claim, dispute, or controversy ... arising from or relating to this Agreement or *any* check or instrument cashed by CheckPoint or fee charged by CheckPoint." *Id.* at 634 (alteration in original) (emphasis added). The plaintiff sought relief on account of the company's check-cashing practices. *See id.* at 634–35. Because there was "no dispute that [the] claims [fell] within the scope of the Arbitration Agreement," the Fourth Circuit reversed the district court and ordered arbitration in accordance with the FAA. *Id.* at 639.

■■ State law generally determines the validity of any agreement to arbitrate. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). State law also governs any law or equity defenses applicable to an arbitration agreement, so long as that law "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n..9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)). The FAA preempts state laws that apply "*only* to arbitration provisions"—that is, that are not applicable to contracts generally—because they "directly conflict[ ]" with the Act's pro-arbitration mandate. *See id.* at 687–88, 116 S.Ct. 1652.

### b. Choice of Law

■■ A federal district court sitting in diversity applies the choice-of-law rules of its forum state. *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir.1999). West Virginia law provides that "the law of the state in which a contract is made and to be performed governs the construction of a contract when it is involved in litigation in the courts of this State." *Gen. Elec. Co. v. Keyser*, 166 W.Va. 456, 275 S.E.2d 289, 292 (1981) (quoting *Mich. Nat'l Bank v. Mattingly*, 158 W.Va. 621, 212 S.E.2d 754, 755 (1975)). West Virginia law further provides that a choice-of-law provision "will be upheld unless the chosen state has no substantial relationship to the parties to the transaction or unless the application of the law of the chosen state would be contrary to the fundamental public policy of" this state. *Bryan v. Mass. Mut. Life Ins. Co.*, 178 W.Va. 773, 364 S.E.2d 786, 790 (1987).

■■ The court applies forum law to determine whether the parties validly agreed to apply the law of another forum to this dispute. *See* Restatement (Second) of Conflicts of Laws § 187 cmt. b; *see also Keyser*, 275 S.E.2d at 293 (relying in part on § 187 to uphold a choice-of-law clause). If the parties did so agree, then the law of the chosen forum governs all claims related to the rights and duties of the parties' agreement. *See* Restatement § 187 cmt. d. "[I]n the absence of extraordinary circumstances, the failure to read a contract before signing it does not excuse a person from being bound by its terms." *Reddy v. Cmty. Health Foundation of Man*, 171 W.Va. 368, 298 S.E.2d 906, 910 (1982). The state court plaintiffs are competent and the subject matter to which the agreements detailed herein pertain, investment services, is lawful. Both Merrill Lynch

and the state court plaintiffs gave good and valuable consideration. Merrill Lynch presented the relevant agreements to the state court plaintiffs, and each state court plaintiff was free to read and review the agreements and to refuse to sign any or all of them. By executing the relevant agreements, the state court plaintiffs clearly indicated their assent to the terms of the agreements. Because they were free to review the agreements and to refuse to sign the agreements, there are no exceptional circumstances that relieve the state court plaintiffs from the general rule that the failure to read a contract does not excuse one from obligations thereunder. All of the relevant agreements designated New York law as the law that would govern the parties' relationship in clear and unambiguous language. Merrill Lynch accepted the agreements by maintaining control over the state court plaintiffs' assets with the intention of performing its obligations under the relevant agreements. The court accordingly finds that the state court plaintiffs and Merrill Lynch validly agreed to apply New York law to the present dispute.

### c. Agreement to Arbitrate

 Under New York law, a contract is formed where there is "a manifestation of mutual assent [that is] sufficiently definite." The court first considers whether or not there is "a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract." In order to form a binding agreement, the parties must manifest mutual assent to the essential terms of the agreement. *See Express Indus. & Terminal Corp. v. New York State Dept. of Transp.*, 93 N.Y.2d 584, 693 N.Y.S.2d 857, 715 N.E.2d 1050, 1053 (1999). An offer can be accepted by a party's conduct or acquiescence. *See Liner Tech. Inc. v. Hayes*, 213 A.D.2d 881, 624 N.Y.S.2d 284, 285 (3d Dep't 1995). A party's acceptance must be unambiguous

and unequivocal and must comply with the terms of the offer. *King v. King*, 208 A.D.2d 1143, 617 N.Y.S.2d 593, 594 (N.Y.App.Div.1994).

 New York law provides that as a general rule, a party is conclusively bound by a written agreement to which he has assented, absent a showing of unconscionability, fraud, duress or some other wrongful act by the other party. *Renee Knitwear Corp. v. ADT Security Sys.*, 277 A.D.2d 215, 715 N.Y.S.2d 341, 341–42 (N.Y.App.Div.2000); *see also Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824, 828 (1988); *Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 125 N.E. 814, 816 (N.Y.1920). Each of the state court plaintiffs executed a written agreement providing for the resolution of disputes such as the state court actions by resort to arbitration. Before executing these agreements, the state court plaintiffs had the opportunity to review them and ask questions. All of the agreements contained disclosures just above the signature line stating that the state court plaintiffs were agreeing to arbitration. The state court plaintiffs could have refused to sign the agreements and could have refused to deal with Merrill Lynch. There are thus no exceptional circumstances that justify relief from the general rule that a party is conclusively bound by the terms of his written agreement. By taking custody of the state court plaintiffs' funds and investing them pursuant to the individual agreements, Merrill Lynch demonstrated acceptance. The court accordingly concludes that the state court plaintiffs and Merrill Lynch have made valid agreements to arbitrate.

### d. Law and Equity Defenses

 For an agreement to be unconscionable under New York law, the agreement must be both procedurally and sub-

stantively unconscionable at the time it was made. Whether a provision is procedurally unconscionable depends on the process of contract formation and whether there was an "absence of meaningful choice" for the party claiming unconscionability. This inquiry focuses on the size and setting of the transaction, the use of deceptive or high-pressure tactics, the use of fine print, the experience and education of the party claiming unconscionability, and any disparity in bargaining power. *See Gillman,* 537 N.Y.S.2d 787, 534 N.E.2d at 828. The question of unconscionability is a question of law for the court. *In re Teleserve Sys., Inc.,* 230 A.D.2d 585, 659 N.Y.S.2d 659, 662 (4th Dep't 1997). The New York Court of Appeals has conclusively ruled that a party's claim that he "was unaware of the terms in the [ ] agreement, that the [ ] agreement was never called to his attention, that he never read it, that no one read it to him, and that, indeed, he did not know of its existence ... does not support a determination of procedural unconscionability." *Gillman,* 537 N.Y.S.2d 787, 534 N.E.2d at 828–29. The Court of Appeals reasoned that the claimant had the opportunity to read the agreement and, moreover, that the provision at issue had been placed in bold type directly above the signature line. *See id.* at 829.

■■■ New York law further provides that in "exceptional cases" a provision may be unconscionable notwithstanding its lack of procedural unconscionability if the provision is "so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Id.* To be substantively unconscionable, an agreement or term must be "unreasonably favorable" to the other party. *See id.* A provision is unconscionable if it is "egregiously oppressive" and results "in a contract such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would

accept on the other." *Avildsen v. Prystay,* 171 A.D.2d 13, 574 N.Y.S.2d 535, 535–36 (N.Y.App.Div.1991) (internal quotations omitted).

In *Teleserve Systems,* the Supreme Court, Appellate Division ruled that an arbitration clause requiring claimants to pay for the cost of arbitration was unconscionable. *See Teleserve Sys.,* 659 N.Y.S.2d at 664. In that case, the total filing fee due the plaintiff was $204,000. The fee was tied to the amount of the claim and the plaintiff's claim was for $40 million. The court found the $204,000 fee "patently excessive" and stated that it had "no reasonable relation to the arbitration forum's administrative expenses" and was greatly in excess of "typical" arbitration fees. "The practical effect of such an oppressive and burdensome fee is to bar arbitration of petitioner's claims against MCI." *Id.* The court did not strike the arbitration provision itself, but instead struck the filing fee requirement. *See id.* at 665.

■■■ Here, the state court plaintiffs all had the opportunity to read the agreements they executed before signing them. The arbitration provisions were not "hidden" in small type and disclosure statements appeared just above the places that the state court plaintiffs signed the agreements. Merrill Lynch (and its agents) did not use "high pressure" tactics, and the state court plaintiffs were always free to refuse to contract with Merrill Lynch. Accordingly, the court concludes that the state court plaintiffs have not demonstrated that the arbitration provisions at issue are procedurally unconscionable under New York law.

Furthermore, the arbitration fees required by the arbitration agreements at issue bear a reasonable relationship to the administrative costs of the arbitral forum. They are not far in excess of typical arbi-

tration fees. Although they exceed the cost of filing a civil action in state court, they are not so high as to effectively preclude the state court plaintiffs from pursuing their claims for relief against Merrill Lynch. The court accordingly concludes that the provisions are not substantively unconscionable under New York law.

## IV. Will Enforcement Violate West Virginia Public Policy?

Because the state court plaintiffs have clearly made otherwise enforceable agreements to arbitrate, the critical issue in this case is whether West Virginia public policy prohibits enforcement of the arbitration agreements here. The Supreme Court of Appeals of West Virginia's decision in *State ex rel. Dunlap v. Berger*, 211 W.Va. 549, 567 S.E.2d 265 (2002), places heightened requirements on various types of contractual provisions. Both parties have extensively argued about the application of that decision to this case. For the reasons detailed in this memorandum opinion, the court concludes that the Federal Arbitration Act preempts West Virginia law to the extent that West Virginia law would impose such heightened requirements on the enforcement of agreements to arbitrate.

### a. West Virginia Public Policy

In *Dunlap*, the West Virginia high court granted a writ of prohibition to prevent the adjudication of a West Virginia plaintiff's claims by arbitration. *See Dunlap*, 567 S.E.2d at 284–85. The Supreme Court of Appeals articulated several bases for its refusal to order arbitration. The court began by noting that the agreement at issue was a contract of adhesion—a form contract drafted by one party with little or no opportunity for negotiation. *See id.* at 273–74. The court then discussed the use

of "exculpatory provisions," terms "that would if applied effectively limit a party's legal exposure, accountability, or liability in a fashion that would otherwise not exist under general law." *Id.* at 274. In what ultimately appears to be the basis of its decision, the court wrote that "we recognize and hold that exculpatory provisions in a contract of adhesion that if applied would prohibit or substantially limit a person from enforcing or vindicating rights and protections or from seeking and obtaining statutory or common law relief and remedies that are afforded by or arise under state law that exists for the benefit and protection of the public are unconscionable; unless the court determines that exceptional circumstances exist that make the provisions conscionable." *Id.* at 275–76.[2]

The *Dunlap* court went on to address several specific problems with enforcement of the arbitration clause in that case. The court first addressed the issue of waiving trial by jury. Because the rights to access the courts and to a jury trial are fundamental in West Virginia, courts should impose stringent requirements before finding their waiver. *See id.* at 276–77. The court briefly discussed the Federal Arbitration Act and concluded that it need not reach the issue of whether the Act preempted this state-law guarantee because "other issues are present ... that permit us to rule." *Id.* at 277. In a footnote discussion, the court noted that absent such preemption concerns, "we see no reason why a strict 'knowing and intelligent waiver' standard should not ordinarily apply to the waiver of the rights to a jury trial in the public court system." *Id.* at 277 n. 7.

---

**2.** The *Dunlap* opinion actually articulates three "holdings." *See Dunlap*, 567 S.E.2d at 275–76, 280, 282.

The court then discussed terms in the parties' agreement that waived both punitive damages and class action relief. The court detailed the importance of both forms of relief in West Virginia law, *see id.* at 277–79, and found the contract terms waiving them "clearly unconscionable," *id.* at 280. The court discussed the applicability of the Act and concluded: "we hold that the Federal Arbitration Act ... does not bar a state court that is examining exculpatory provisions in a contract of adhesion that if applied would prohibit or substantially limit a person from enforcing and vindicating rights and protections or from seeking and obtaining statutory or common-law relief and remedies that are afforded by or arise under state law that exists for the benefit and protection of the public from considering whether the provisions are unconscionable—merely because the prohibiting or limiting provisions are part of or tied to provisions in the contract relating to arbitration." *Id.*

The *Dunlap* court finally discussed the costs of arbitration. The court noted that one party could impose high arbitration costs on another as a means of effectively shielding itself from liability. *See id.* at 281. Accordingly, the court made its third holding: "we hold that provisions in a contract of adhesion that if applied would impose unreasonably burdensome costs upon or would have a substantial deterrent effect upon a person seeking to enforce and vindicate rights and protections or to obtain statutory or common-law relief and remedies that are afforded by or arise under state law that exists for the benefit and protection of the public are unconscionable; unless the court determines that exceptional circumstances make the provisions conscionable." *Id.* at 282. The court ruled that the party objecting to arbitration would have the burden of showing that costs were unreasonably high, a question of law for the court. *See id.* at 281–83. In the end, the *Dunlap* court

concluded that the specific cost terms at issue—the parties were to pay for arbitration equally, *id.* at 281—did not necessarily indicate that costs were excessive, *see id.* at 283. Accordingly, the court found that it should not prohibit that arbitration on account of burdensome costs. *Id.*

The state court plaintiffs also argue that because the arbitral forum will have more limited discovery procedures than would a West Virginia circuit court, the *Dunlap* waiver-of-rights-and-remedies standard should apply. Although the West Virginia Constitution protects trial and jury rights, *see* W. Va. Const. Art. III §§ 13, 17, the Supreme Court of Appeals has stated that procedural rules "do not restrict the original and general jurisdiction of courts of record," but instead "establish procedures for the orderly process of civil cases." *Arlan's Dept. Store of Huntington, Inc. v. Conaty*, 162 W.Va. 893, 253 S.E.2d 522, 525 (1979). At the same time, the *Dunlap* court found that a heightened standard should apply to the waiver of class action relief and punitive damages, neither of which are expressly protected by the West Virginia Constitution. *See Dunlap*, 567 S.E.2d at 277–80. In so finding, the *Dunlap* court focused on the importance of both remedies to ensuring that rights are effectively enforced and vindicated. *See id.* at 278–79. As discovery procedures are clearly quite important to the resolution of civil controversies in West Virginia courts, *see State ex rel. Pritt v. Vickers*, 214 W.Va. 221, 588 S.E.2d 210, 215 (2003) (essential purpose of discovery is development of issues and efficient resolution of disputes), contractual provisions that have the effect of waiving discovery procedures might also be governed by the *Dunlap* "heightened waiver" standard.

### b. Preemption Under the Federal Arbitration Act

Congress's intent in passing the Federal Arbitration Act was to ensure that arbitra-

tion, when selected by the parties to an agreement, proceeds speedily and without judicial delay or obstruction. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). The Act contains no express preemption provision, and Congress did not intend to occupy the entire field of arbitration. *Volt Information Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.,* 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Accordingly, the Act preempts state law "to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 477, 109 S.Ct. 1248 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

The Act's essential requirement is that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Accordingly, "generally applicable contract defenses" may preclude enforcement of an otherwise valid agreement to arbitrate, but "state laws applicable *only* to arbitration provisions" are invalid. *See Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). The Act thus prevents states from "singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" *Id.* (quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). Effectively, the Act "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." *Id.* at 16, 104 S.Ct. 852.

■ The Federal Arbitration Act does not, of course, displace state law simply because it concerns or affects arbitration. In *Volt,* the Supreme Court ruled that the Act did not preempt a California law that directed a stay of arbitration while related claims, not subject to arbitration, were pending in state court. *See Volt,* 489 U.S. at 478–79, 109 S.Ct. 1248. The Court reasoned that because the parties had explicitly made their agreement subject to California law, the application of a state-law rule that delayed arbitration was consistent with the Act's purpose of enforcing agreements to arbitrate according to their terms. *See id.* In later decisions, the Court has clarified that the "rule examined in *Volt* determined only the efficient order of proceedings; it did not affect the enforceability of the arbitration agreement itself." *Doctor's Associates,* 517 U.S. at 688, 116 S.Ct. 1652. The Act in fact preempts state rules that have the effect of invalidating arbitration agreements, as opposed to enforcing them under generally applicable rules. *See id.*

### c. Analysis

■ The state court plaintiffs have not sought class action relief, and the parties do not argue that the availability of punitive damages as a remedy is drawn into question by enforcement of the arbitration agreements here. Thus, determining whether enforcement of the arbitration provisions violates West Virginia public policy does not require the court to consider either of the bases addressed in *Dunlap.* Although the precise grounds of that case are not at issue here, *Dunlap* is still instructive on the juxtaposition of state and federal law.

The state court plaintiffs have argued that three specific concerns require the court to apply the *Dunlap* standard as a matter of public policy. The first of these

is the right to trial by jury. Because ordering these claims to arbitration will prevent the state court plaintiffs from presenting their case before a West Virginia tribunal and jury, the *Dunlap* standard should apply to prevent finding a waiver absent the heightened requirements. Under this standard, it is almost certain that West Virginia law would preclude enforcement of the arbitration agreements because there do not appear to be "exceptional circumstances" making the waivers conscionable.

The problem with applying this standard is that although it does not *facially* apply to arbitration, its effect is to preclude the enforcement of agreements to arbitrate or, at least, to place them on a different footing than other contracts. When parties agree to resolve their disputes through arbitration, they concomitantly agree to *not* resolve their disputes by going to court. Thus, a rule imposing heightened requirements on "agreements not to go to court" necessarily imposes heightened requirements on "agreements to go to arbitration." Because the Act requires that arbitration agreements be on the same legal footing as "any contract," such a rule would be preempted by the Act as it applied to prevent the enforcement of otherwise valid agreements to arbitrate. The Court of Appeals for the Fourth Circuit substantively embraced this reasoning in a 2001 decision:

> Nor does the fact that the appellees waived their right to a jury trial require the court to evaluate the agreement to arbitrate under a more demanding standard. It is clear that a party may waive her right to adjudicate disputes in a judicial forum. Similarly, the right to a jury trial attaches in the context of judicial proceedings after it is determined that litigation should proceed before a court. Thus, the "loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate."

*Sydnor v. Conseco Fin. Servicing Corp.,* 252 F.3d 302, 307 (4th Cir.2001) (quoting *Pierson v. Dean, Witter, Reynolds, Inc.,* 742 F.2d 334, 339 (7th Cir.1984)).

The other bases offered by the state court plaintiffs present somewhat closer questions. Although discovery procedures may not be protected under *Dunlap* to begin with, this opinion assumes (without deciding) that they are. Again, because there do not appear to be exceptional circumstances making the waiver of discovery tools conscionable, *Dunlap* would require this court to refuse to enforce the agreement as a matter of public policy. The problem with this result is that it unreasonably elevates form over substance. When parties agree to resolve their disputes through arbitration, they also agree to not resolve their disputes by going to court, or more specifically, by resorting to rules of court procedure. Applying a state rule of law that imposes heightened requirements on "agreements that waive rights under the Rules of Civil Procedure" would necessarily impose heightened requirements on "agreements to not submit claims to the Rules of Civil Procedure"—and this would obstruct agreements to resolve claims in an arbitral forum instead of a court. Although such a rule would leave "arbitration" undisturbed as an abstract matter, the rule would have the effect of placing agreements to arbitrate (agreements to not resolve disputes through standard civil procedure) on a different footing than other contracts. "An arbitral forum need not replicate the judicial forum." *Hooters of Am., Inc. v. Phillips,* 173 F.3d 933, 940 (4th Cir.1999).

The final basis offered by the state court plaintiffs is that arbitration will impose unreasonable and burdensome costs. One of the *Dunlap* court's holdings was, of

course, that contract provisions imposing unreasonably burdensome costs or substantially deterring the vindication and enforcement of rights and remedies were unconscionable, unless the court specifically found them conscionable due to exceptional circumstances. *Dunlap*, 567 S.E.2d at 282–83. This public policy requirement does not place arbitration agreements on a different footing than other contracts because unreasonable costs do not necessarily follow when parties agree to arbitrate. Moreover, arbitration may be less expensive than resort to a civil lawsuit. *See Hooters*, 173 F.3d at 936 ("The arbitration of disputes enables parties to avoid the costs associated with pursuing a judicial resolution of their grievances.").

In *Dunlap*, the court found the record insufficient to determine whether fees and costs were unreasonably burdensome. *See Dunlap*, 567 S.E.2d at 283. Here, the court has made specific findings as to the costs of arbitration and how those costs are to be borne by the parties. Thus, this court is in a position to rule on this contention. Although the initial filing fee for an arbitration claim is higher than the initial filing fee in West Virginia state court, the court finds and concludes that the costs associated with arbitration are not unreasonably burdensome as they do not effectively prevent a plaintiff from enforcing or vindicating his or her rights.

### V. Conclusion

In the end, it may be that this case is about the law's conscious decision to embrace certain values. The embrace of one value often comes at the expense of another. One value the law so embraces is the idea that an adult is presumptively bound to, and responsible for, the terms of a written agreement to which he or she voluntarily assents. Another value, that articulated in this memorandum opinion, is that Congress has plenary control over interstate commerce, even when that control does violence to fundamental principles of state law. It is axiomatic that one value or the other must give way; under our constitutional framework, it is state control over this area of commerce that loses. The court feels that this end is in accord with Congress's intent, which was to ensure that arbitration agreements are uniformly enforced throughout the United States, rather than being subjected to a patchwork of varied state-law requirements.

The court holds that West Virginia public policy, as expressed in *Dunlap*, does not prevent enforcement of the arbitration agreements at issue here.

■■■ Having concluded that Merrill Lynch is entitled to relief pursuant to § 4 of the Act, the court next considers whether an order staying the state court actions, as Merrill Lynch has requested, is appropriate relief. Section 4 allows an aggrieved party to petition for an "order directing that such arbitration proceed," but (unlike § 3) does not authorize the court to issue a stay against a pending proceeding in state court. *See* 9 U.S.C. § 4. The Anti–Injunction Act prohibits a federal court from enjoining state court proceedings except in certain instances. 28 U.S.C. § 2283. One such instance is when an injunction is necessary "to protect or effectuate [the court's] judgments." At the present moment, it does not appear that a stay directed at the court hearing the state court actions is necessary to protect or effectuate the court's judgment. The court believes that the parties and the Circuit Court of McDowell County will likely conform their conduct to the expectations of law. *See Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 714 n. 3 (5th Cir.2002).

Accordingly, the court has entered its Findings of Fact and Conclusions of Law in Support of Order Directing Arbitration

of State Court Claims (Doc. No. 109), directing the parties to arbitrate in accordance with § 3 of the Act. The court will entertain a renewed motion for a stay order in the unlikely event the order is necessary to protect this judgment.

The Clerk is directed to send by mail a copy of this memorandum opinion to counsel of record.