SANDRA K. RAGAN et al., Indiv. and on Behalf of Others Similarly Situated, Plaintiffs-Appellees, v. AT AND T CORPORATION, Defendant-Appellant.

Fifth District   No. 5—03—0038

Opinion filed March 1, 2005.—Rehearing denied March 29, 2005.

1144

Louis F. Bonacorsi and Michael E. Franklin, both of Bryan Cave, L.L.P., of St. Louis, Missouri, and Mark B. Blocker and John K. Van De Weert, both of Sidley, Austin, Brown & Wood, L.L.P., of Chicago, for appellant.

Paul M. Weiss and Tod A. Lewis, both of Freed & Weiss, L.L.C., of Chicago, and Charles W. Chapman, of Charles W. Chapman, Chtrd., and L. Thomas Lakin, Bradley M. Lakin, Richard J. Burke, and Thomas G. Maag, all of Lakin Law Firm, P.C., both of Wood River, for appellees.

PRESIDING JUSTICE DONOVAN delivered the opinion of the court:

This is an appeal from the denial of a motion to compel arbitration and to dismiss or stay proceedings in a putative class action lawsuit brought by Sandra K. Ragan and Dennis Mangiaracino, on behalf of themselves and others similarly situated (plaintiffs), against AT&T Corp. (defendant), pursuant to the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2002)) and "substantially similar state consumer protection statutes enacted to protect consumers against unfair, deceptive[,] or fraudulent business practices." The fraud alleged in plaintiffs' amended complaint, filed July 31, 2002, in the circuit court of Madison County, relates to defendant's allegedly deceptive inclusion on plaintiffs' bills of a charge for the Universal Service Fund (USF), a support mechanism established by the Federal Communications Commission (FCC) that

subsidizes telecommunications services for low-income and rural telephone customers, schools, and libraries. Plaintiffs allege that defendant presents this charge on its bills in a deceptive manner in that it appears to be a pass-through charge similar to taxes, from which defendant does not profit. Plaintiffs further allege that, in actuality, defendant charges the customer far more than it pays into the USF, thereby reaping a profit from this charge. The complaint alleges that plaintiffs were deceptively billed USF charges under the guise of a government-imposed subscriber or pass-through charge and that had plaintiffs known that defendant was not simply passing these charges through to the USF but was profiting from them, they might have refused to pay the charge or switched to another provider.

Defendant responded to the amended complaint by filing, on September 18, 2002, a motion to compel arbitration and to dismiss or stay the proceedings in the circuit court. Defendant's motion was based on its written "Consumer Services Agreement" (CSA), which it contends constitutes a written contract between it and its customers, including plaintiffs, and which provides for final and binding arbitration of any dispute between the parties that cannot be resolved informally, in small claims court, or before the FCC. The arbitration provision also explicitly prohibits class actions. The CSA was mailed to all of defendant's customers, some in their monthly bills and some in a separate mailing, prior to its effective date of August 1, 2001. The named plaintiffs were sent their CSAs in a separate mailing. The CSA informs the customer that by using or paying for defendant's services, the customer agrees to the terms of the CSA. It further informs the customer that it may choose not to be bound by the terms of the CSA by cancelling its service with defendant immediately by telephoning a toll-free number.

In its memorandum of law in support of its motion to compel arbitration, defendant points out that there is a strong public policy favoring the enforcement of arbitration agreements and that, by continuing to use and pay for defendant's services after receipt of the CSA, plaintiffs agreed to be bound by the arbitration provision of the contract. Defendant argues that the arbitration provision contained in the CSA is presumptively valid, mandatory, and applicable to plaintiffs' claim. Defendant further argues that there is no meritorious basis for declining to enforce the arbitration provision because any state-law basis to challenge the validity of the arbitration provision is preempted by federal law, more precisely, the Communications Act of 1934 (FCA) (47 U.S.C. § 151 *et seq.* (2000)), as amended by the Telecommunications Act of 1996 (Pub. L. No. 104—104, 110 Stat. 56 (1996)), and may not be raised in the circuit court.

Plaintiffs filed, on October 22, 2002, their opposition to the motion to compel arbitration. In their memorandum of law, plaintiffs argue that the FCA does not preempt the application of state contract and consumer protection laws to the CSA and that the arbitration provision is unenforceable under state law for numerous reasons: (1) plaintiffs' silence did not constitute an acceptance of the CSA's arbitration provisions, (2) the arbitration provision is unconscionable because it prohibits class action relief, (3) enforcement is impossible because the American Arbitration Association (AAA), the contractually mandated arbitration organization, refuses to arbitrate pursuant to the CSA because the CSA fails to meet the AAA's consumer due process requirements, (4) the arbitration provision prevents an arbitrator from awarding relief specifically authorized by the Consumer Fraud and Deceptive Business Practices Act, (5) the arbitration provision is being used by defendant to further its fraudulent scheme and insulate itself from judicial scrutiny, and (6) arbitration under the CSA is prohibitively expensive.

The motion to compel arbitration and dismiss or stay the proceedings was heard on December 18, 2002. At the close of the hearing, at which no evidence was presented, the circuit court of Madison County entered an order simply denying the motion. The order contains no findings of fact, conclusions of law, or reasoning. Defendant filed a timely notice of interlocutory appeal. We have jurisdiction over the instant appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)). See *Bess v. DirecTV, Inc.*, 351 Ill. App. 3d 1148, 1149, 815 N.E.2d 455, 456 (2004); *Caudle v. Sears, Roebuck & Co.*, 245 Ill. App. 3d 959, 962, 614 N.E.2d 1312, 1315 (1993).

## Standard of Review

■ In an appeal from a denial of a motion to compel arbitration without an evidentiary hearing, the standard of review is *de novo*. *Zobrist v. Verizon Wireless*, 354 Ill. App. 3d 1139, 1142 (2004); *Travis v. American Manufacturers Mutual Insurance Co.*, 335 Ill. App. 3d 1171, 1174, 782 N.E.2d 322, 325 (2002). We find that there is a valid arbitration agreement and that the parties' dispute falls within the scope of that agreement. As a result, we find that the trial court erred in failing to compel arbitration.

## Federal Arbitration Act

■ In 1925, Congress enacted the Federal Arbitration Act (FAA) (now 9 U.S.C. § 1 *et seq.* (2000)) " 'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts[ ] and to place arbitration agreements upon the same footing as other contracts.' "

*Borowiec v. Gateway 2000, Inc.*, 209 Ill. 2d 376, 384, 808 N.E.2d 957, 962 (2004), quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 114 L. Ed. 2d 26, 36, 111 S. Ct. 1647, 1651 (1991). While the United States Supreme Court has emphasized the point that federal FAA policy favors the enforcement of valid arbitration agreements (*Gilmer*, 500 U.S. at 24-25, 114 L. Ed. 2d at 36, 111 S. Ct. at 1651), the Court has also emphatically stated that a party can be forced into arbitration only if he or she has in fact entered into a valid, enforceable contract waiving his or her right to a judicial forum. *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 89 L. Ed. 2d 648, 655, 106 S. Ct. 1415, 1418 (1986).

■ Whether the parties actually agreed to arbitrate is determined pursuant to state-law contract principles. *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 758-59 (7th Cir. 2001); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997). The United States Supreme Court confirmed that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 134 L. Ed. 2d 902, 909, 116 S. Ct. 1652, 1656 (1996). In *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 156 L. Ed. 2d 414, 123 S. Ct. 2402 (2003), the Court decided that limited arbitration matters are to be decided by the court. These matters "include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Financial Corp.*, 539 U.S. at 452, 156 L. Ed. 2d at 422, 123 S. Ct. at 2407.

The Illinois Supreme Court has described the limited role of the trial court as follows:

> "When presented with a motion to stay litigation pending arbitration under section 3 of the FAA, the court's inquiry is limited to whether an agreement to arbitrate exists and whether it encompasses the issue in dispute. If the court finds that an agreement to arbitrate exists and the issue presented is within the scope of that agreement, a stay under section 3 of the FAA is mandatory." *Jensen v. Quik International*, 213 Ill. 2d 119, 124-25, 820 N.E.2d 462, 465 (2004).

## Plaintiffs' Acceptance of CSA

Initially we must decide whether the CSA, which contains the disputed arbitration provision, was accepted by plaintiffs. Defendant asserts that plaintiffs' continued use of defendant's services resulted in the acceptance of its terms. Plaintiffs argue that there is no contract because their mere silence upon receipt of the CSA is not sufficient to constitute an acceptance of defendant's offer.

The question of whether silence in the face of an offer can constitute acceptance for purposes of contract formation has been addressed by both federal and state courts. Illinois courts have recognized that silence can constitute an acceptance of an offer when it is reasonable, because of prior dealings or otherwise, that the offeree should notify the offeror if he does not intend to accept the offer. See *Fineman v. Citicorp*, 137 Ill. App. 3d 1035, 1042-43, 485 N.E.2d 591, 595-96 (1985); *Garber v. Harris Trust & Savings Bank*, 104 Ill. App. 3d 675, 432 N.E.2d 1309 (1982). In *Fineman*, silence in response to a mailed notification of an amendment of a credit card agreement constituted an acceptance of the amended terms. *Fineman*, 137 Ill. App. 3d at 1042-43, 485 N.E.2d at 595-96. In *Garber*, the court, explicitly following the decision of a Minnesota court which held that a party's continued use of a checking account overdraft privilege after a notification of an increase in its interest rate constituted an acceptance of the new interest rate, held that continued use of a credit card after a notification of an amendment of its terms constituted an acceptance of the new term. *Garber*, 104 Ill. App. 3d at 684, 432 N.E.2d at 1315.

The New York appellate court recently addressed this issue in the case of *Tsadilas v. Providian National Bank*, 13 A.D.3d 190, 786 N.Y.S.2d 478 (2004). In finding that the continued use of a credit card evidenced the plaintiff's acceptance of the amended terms, the court stated:

"Defendant sufficiently proved that it sent the arbitration provision to plaintiff (see, *e.g.*, *Kurz v. Chase Manhattan Bank USA[, N.A.]*, 319 F. Supp. 2d 457, 464 (S.D.N.Y. 2004)). Plaintiff consented to it by failing to opt out (*cf. Providian Natl. Bank v. Screws*, [No. 1020668 (Ala. October 3, 2003)]) and by continuing to use her credit cards (see, *e.g.*, *Kurz*, 319 F. Supp. 2d at 465-466). Plaintiff is bound by the arbitration provision even if she did not read it (see, *e.g.*, *Brower v. Gateway 2000[, Inc.]*, 246 A.D.2d 246, 252, 676 N.Y.S.2d 569 (1998)). *Continental Ins. Co. v. Seppala & Aho Constr. Co.*, 121 N.H. 374, 430 A.2d 157 (1981)[,] and *Storms v. United States Fid. & Guar. Co.*, 118 N.H. 427, 388 A.2d 578 (1978)[,] do not avail plaintiff because the arbitration provision is clear; therefore, one need not inquire beyond its language to determine plaintiff's reasonable expectations." *Tsadilas*, 13 A.D.3d at 190-91, 786 N.Y.S.2d at 480.

In *Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002), the Seventh Circuit Court of Appeals, applying Illinois law to facts identical to those in the case at bar, held that where an offeree takes the benefits of offered services with a reasonable opportunity to reject them and a reason to know that they were offered with the expecta-

tion of compensation, his silence and inaction operates as an acceptance of the offer. The Seventh Circuit found that the CSA clearly provided a mechanism for rejecting the offer and that the customer had a reasonable opportunity to reject the offer but failed to do so. Instead, the customer continued to use the defendant's services, which were offered with the clear and explicit expectation of compensation. Under those circumstances, the customer's silence constituted acceptance. *Boomer*, 309 F.3d 404.

■ Here, plaintiffs had prior dealings with defendant and had, for some time prior to receipt of the CSA, used defendant's services. Defendant mailed a copy of the CSA to its customers, including plaintiffs, prior to the effective date. The offer was made with the clear expectation of compensation. The CSA provided a reasonable opportunity and mechanism for rejecting the offer, of which plaintiffs failed to avail themselves. Under these circumstances, it is reasonable that plaintiffs should have notified defendant if they did not wish to accept the offer presented by the CSA. Plaintiffs' silence and inaction upon receipt of the CSA constituted an acceptance of defendant's offer presented in the CSA. Accordingly, we conclude that there is an arbitration agreement between the parties.

### Federal Preemption of State-Law Challenges

■ Defendant argues that there is no meritorious basis for declining to enforce the arbitration provision because any state-law basis to challenge its validity is preempted by federal law. Two circuits of the United States Court of Appeals have considered the question of federal preemption of state-law challenges to the identical arbitration agreement at issue here. *Boomer v. AT&T Corp.*, 309 F.3d 404 (7th Cir. 2002); *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003).

In *Boomer*, the plaintiff brought a cause of action similar to that brought in the case at bar in that the plaintiff alleged that the defendant had overcharged him for the USF. The defendant sought to compel arbitration and to dismiss or stay the pending action on the basis of the same CSA and arbitration provision involved here. The plaintiff argued that the arbitration agreement was unconscionable and unenforceable under Illinois law. The district court denied the motion to compel arbitration, and the defendant appealed, arguing that the plaintiff's state-law challenge to the terms and conditions of the CSA was preempted by the FCA and that the plaintiff was therefore bound by the arbitration agreement. The Seventh Circuit agreed with the defendant. The court found that sections 201(b) and 202(a) of the FCA (47 U.S.C. §§ 201(b), 202(a) (2000)), when read together, demonstrate a congressional intent that individual long-distance

customers throughout the United States receive uniform rates, terms, and conditions of service and that it is this antidiscriminatory policy which lies at the heart of the common-carrier section of the FCA. *Boomer*, 309 F.3d at 418. The court determined that sections 201(b) and 202(a) impliedly preempt state laws that interfere with or conflict with the congressional intent of uniformity as expressed in these sections for three reasons:

> "First, these provisions [(sections 201(b) and 202(a))], and the [FCA] in general, demonstrate a congressional intent that customers of individual long-distance carriers receive uniform terms and conditions of service; however, allowing a state[-]law challenge to the CSA's arbitration clause would result in customers receiving different terms based on their locality. Second, the incorporation of the arbitration clause in the CSA allows AT&T to offer lower rates, and allowing state law to invalidate this clause will affect the rates AT&T offers, resulting in discriminatory rate structures. Third, Section 201 declares unlawful rates, terms[,] and conditions which are not just and reasonable, demonstrating Congress's intent that federal law govern the validity of the terms and conditions of long-distance service contracts." *Boomer*, 309 F.3d at 418.

The Seventh Circuit held that the plaintiff's state-law challenges to the CSA were impliedly preempted by sections 201(b) and 202(a) of the FCA because allowing these state-law challenges would conflict with the federal objective expressed in these sections. The court went on to find that "allowing state law to determine the validity of the various terms and conditions agreed upon by long-distance providers and their customers will create a labyrinth of rates, terms[,] and conditions and this violates Congress's intent in passing the [FCA]." *Boomer*, 309 F.3d at 420.

In *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003), the plaintiffs brought a class action against AT&T, alleging that the CSA's provision prohibiting class actions violated California's Consumer Legal Remedies Act and the state's Unfair Practices Act. The district court found the CSA unconscionable and enjoined the enforcement of a number of its provisions, including the arbitration provision. AT&T appealed on the ground that the application of California's consumer protection laws is preempted by the FCA. The Ninth Circuit disagreed and affirmed the district court.

Contrary to *Boomer*, the Ninth Circuit held that it was section 203 of the FCA (47 U.S.C. § 203 (2000)), and not sections 201 and 202, which preempted state-law challenges to the rates, terms, and conditions of service of long-distance carriers. *Ting*, 319 F.3d at 1138. Section 203 required all telecommunications carriers to file with the FCC

a list of tariffs, or schedules, showing all charges and the classifications, practices, and regulations affecting those charges. 47 U.S.C. § 203(a) (2000). It prohibited carriers from offering their services to any customer on any terms or conditions that differed from those stated in the filed tariff. 47 U.S.C. § 203(c) (2000). Under the filed-rate doctrine, rates filed with the FCC bound both carriers and customers with the force of law, and the rights and liabilities defined by the filed tariff could not be varied or enlarged by either contract or tort of the carrier. *Ting*, 319 F.3d at 1131. Accordingly, federal law preempted any state-law claim seeking to enforce contractual provisions that differed from a filed rate. *Ting*, 319 F.3d at 1131. Thus, it was section 203 that preempted state-law challenges to tariffs, not sections 201 and 202.

In its decision, the Ninth Circuit noted that the FCA had been amended by the Telecommunications Act of 1996 (Pub. L. No. 104-104, 110 Stat. 56 (1996)) to do away with tariffs and allow free market competition between competing carriers. The FCC had concluded that tariffs were no longer necessary because market forces were sufficient to protect consumers from unjust, unreasonable, and discriminatory rates, terms, and conditions. *Ting*, 319 F.3d at 1132. Instead of filed tariffs, the carriers were to enter into contracts with their customers. The FCC decision triggered the advent of the CSA, the provisions of which have been questioned in *Ting, Boomer*, and the case at bar. The Ninth Circuit reasoned that when Congress amended the FCA to do away with section 203 and the filed-rate doctrine, it also intended to do away with federal preemption of state-law challenges to contracts between consumers and carriers. *Ting*, 319 F.3d at 1141. It was the tariff requirement of section 203 and the filed-rate doctrine thereunder that required such strict uniformity and provided immunity from state-law challenge. When the tariff system was done away with by the 1996 amendment, so was the preemption doctrine.

> "Now that the FCC no longer enforces § 203's filing requirement, the old statutory scheme—which is the foundation of AT&T's argument—fails to support AT&T's argument. AT&T's argument that § 202(a) satisfies both its own anti[ ]discrimination function as well as § 203's preemption function is untenable. *** We thus reject AT&T's interpretation of § 202, which would 'render[ ] superfluous' § 203 of the 1934 Act. Because §§ 201(b) and 202(a) survived detariffing, the substantive principles of reasonableness and nondiscrimination remain intact. But the same cannot be said of the principle of preemption, which was a product of the filed[-]rate doctrine which, by definition, did not survive detariffing." *Ting*, 319 F.3d at 1139.

The Ninth Circuit recognized that the substantive principles of

reasonableness and nondiscrimination set forth in sections 201 and 202 remain intact, but it concluded that section 202 had never been interpreted to require strict uniformity and only prohibits preferences and discrimination which are unjust or unreasonable. *Ting*, 319 F.3d at 1140. If the application of different state contract and consumer protection laws results in different treatment of customers, those differences between states violate section 202 only if they result in unjust and unreasonable discrimination or preferences. *Ting*, 319 F.3d at 1140. Contractual differences between customers of different states are unjust or unreasonable only if they lack a neutral and rational basis. *Ting*, 319 F.3d at 1140. Under the Ninth Circuit's interpretation, sections 201(b) and 202(a) permit some reasonable variation in rates, terms, and conditions of service.

The First District Appellate Court addressed the preemption issue in *Ramette v. AT&T Corp.*, 351 Ill. App. 3d 73, 812 N.E.2d 504 (2004). In *Ramette*, plaintiff filed a class action lawsuit against AT&T based on AT&T's decision to charge its customers $1.50 per month to continue receiving their long-distance telephone bills with their local service telephone bills. Ramette alleged that the fee was imposed without any disclosure from AT&T that it would send a separate long-distance bill at no charge. The imposition of this fee closely coincided with the first-ever contract between AT&T and its customers, the CSA. Just as in this case, the relationship between AT&T and its customers had been previously governed by tariffs filed with the FCC. AT&T moved to compel the arbitration of the claims pursuant to the CSA's arbitration provision. Ramette argued that the legal remedies in the CSA, including the arbitration provision, were unconscionable under Illinois law. The circuit court granted AT&T's motion to compel arbitration, finding that the Communications Act of 1934 (47 U.S.C. § 203 (2000)) preempts all state-law challenges to the enforcement of the arbitration clause. The circuit court also found that the CSA was not unconscionable as a matter of law.

Ramette filed an interlocutory appeal pursuant to Supreme Court Rule 307 (188 Ill. 2d R. 307). The First District affirmed, stating in pertinent part:

> "We agree with *Boomer* and [*In re Universal Service Fund Telephone Billing Practices Litigation*, 300 F. Supp. 2d 1107, 1117 (D. Kan. 2003)], that the congressional objective of achieving uniformity in rates, terms, and conditions of service survived detariffing. Allowing state challenges would impede the congressional objective of achieving uniformity in telecommunication services. AT&T would be faced with different laws from different states and would have no uniform body of federal law to follow in proposing

services and contracts. This would frustrate the congressional purpose of uniformity. Furthermore, state-law challenges would destroy the consistency of rates and cause discrimination. Customers in some states would be bound by an arbitration agreement that would not bind customers in other states. We find the congressional objective of achieving uniformity sufficiently strong. Therefore, we follow the reasoning in *Boomer*[ ] and find that the FCA preempts Ramette's state-law unconscionability challenge to AT&T's arbitration clause." *Ramette*, 351 Ill. App. 3d at 85-86, 812 N.E.2d at 514.

As the previous quote reflects, the First District also relied in part on *In re Universal Service Fund Telephone Billing Practices Litigation*, 300 F. Supp. 2d 1107, 1117 (D. Kan. 2003) (*Universal Service*), in reaching its final decision. In *Universal Service*, the district court of Kansas determined that the FCA preempted only state-law substantive unconscionability challenges, and not procedural unconscionability challenges to the enforcement of arbitration clauses:

"Nevertheless, this FCA preemption principle is not absolute. It does not extend to state laws regarding all aspects of long[-]distance carriers' conduct. In the aftermath of the FCC's detariffing orders, AT&T, Sprint, and MCI petitioned the FCC to clarify that federal law, not state law, continues to govern the determination as to whether a nondominant interexchange carrier's rates, terms, and conditions are lawful. The FCC responded, stating:

'We therefore agree with AT&T, Sprint, and WorldCom that *the [FCA] continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable*[ ] *and are not unjustly or unreasonably discriminatory*. While the parties only sought certification that the [FCA] governs the determination as to the lawfulness of rates, terms, and conditions, we note that *the [FCA] does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment*. As stated in the *Second Report and Order*, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.'

[*In re Policy & Rules Concerning the Interstate, Interexchange Marketplace*, 12 F.C.C.R. 15,014, 15,057 (1997)] (emphasis added). This ruling is entitled to deference. See *MCI* [*WorldCom, Inc. v. Federal Communications Comm'n*], 209 F.3d [760,] 764 [(D.C. Cir. 2000)] (holding the FCC's detariffing rulings are entitled to deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837[, 81 L. Ed. 2d 694, 104 S. Ct. 2778] (1984)). Thus, the

FCA continues to govern the propriety of the actual terms and conditions of long[-]distance service contracts. However, all other aspects of the carriers' conduct is subject to other federal and state laws." *Universal Service*, 300 F. Supp. 2d at 1120.

We agree with *Universal Service* and find that the congressional objective of achieving uniformity in rates, terms, and conditions of service remains in full force notwithstanding detariffing and that plaintiffs' procedural unconscionability arguments challenging the validity of the contract formation process itself are not preempted. *Universal Service*, 300 F. Supp. 2d at 1119, 1121. We disagree with *Ramette* and *Boomer* to the extent that they would declare plaintiffs' procedural unconscionability arguments to be preempted.

## Governing Law

■ Before addressing the remaining challenges to the arbitration clause, we must decide which state's law is applicable. Paragraph 8(f) of the CSA contains a "Governing Law" provision, which states:

"This Agreement will be governed by the law of the State of New York, without regard to its choice of law rules, except that the arbitration provisions in Section 7 will be governed by the [FAA]. This governing law provision applies no matter where you reside[ ] or where you use or pay for the Services."

The language of the contract is clear, and neither party has argued any reason that New York law should not be used in deciding the remaining issues before the court. New York law, when applicable, therefore, will be applied to the contract issues in this case. See *Hutcherson v. Sears Roebuck & Co.*, 342 Ill. App. 3d 109, 116, 793 N.E.2d 886, 890-91 (2003). In so doing, we are directed to accept the decision of an intermediate court of review as an accurate statement of the law of its own state, in the absence of any conflicting decision by another appellate court of coordinate jurisdiction in the state or by its highest court of review. *Moscov v. Mutual Life Insurance Company of New York*, 387 Ill. 378, 389, 56 N.E.2d 399, 404-05 (1944).

## Preclusion of Class Relief

■ Plaintiffs contend that the arbitration provision is unconscionable because it prohibits class action relief. Although commentators hold sharply divergent views on this issue,[1] the law of New York is clear. Under New York law, "a contractual proscription against class

---

[1] "Companies are increasingly using arbitral class action prohibitions to insulate themselves from class action liability. These prohibitions are detrimental not only to potential class members but to the public at large in that they are preventing the law from being adequately enforced. In essence, by precluding class actions, companies are engaging in 'do-it-yourself tort

actions *** is neither unconscionable nor violative of public policy." *Ranieri v. Bell Atlantic Mobile*, 304 A.D.2d 353, 354, 759 N.Y.S.2d 448, 449 (2003); see also *Tsadilas*, 13 A.D.3d at 191, 786 N.Y.S.2d at 480. In addition, the court in *Flynn v. Labor Ready, Inc.*, 193 Misc. 2d 721, 751 N.Y.S.2d 722 (N.Y. Sup. 2002), found as follows: "The fact that a class action lawsuit, as plaintiffs contemplate, may be a less costly alternative to arbitration (which is generally less costly than litigation) does not alter the binding effect of the valid arbitration clause contained in the Application for Employment (see *Brower v. Gateway 2000[, Inc.]*, 246 A.D.2d 246, 253, 676 N.Y.S.2d 569 [(1998)])." *Flynn*, 193 Misc. 2d at 723, 751 N.Y.S.2d at 724. Applying New York law, we find that the preclusion of class action relief is not unconscionable.

## Limitation of Liability

■ We will next address two of plaintiffs' contentions together, because they each involve the limitation-of-liability portion of the CSA. Plaintiffs contend that enforcement is impossible because the AAA will refuse to arbitrate pursuant to AT&T's CSA because its "Limitation of Liability" provision fails to meet the AAA's consumer due process requirements. Plaintiffs also argue that the arbitration provision prevents an arbitrator from awarding relief specifically authorized by the Consumer Fraud and Deceptive Business Practices Act. Plaintiffs submitted an affidavit dated July 15, 2002, from an

---

reform,' freeing themselves from liability without having to convince legislatures to change the substantive law. The unconscionability defense, while sometimes successful, is itself too expensive and unwieldy to adequately regulate companies' attempts to elude class action liability." J. Sternlight & E. Jensen, *Using Arbitration to Eliminate Consumer Class Actions: Efficient Business Practice or Unconscionable Abuse?*, 67 Law & Contemp. Probs. 75, 103 (2004). "Over the last fifty years, the Supreme Court has developed a 'national policy favoring arbitration' by expanding the preemptive effect of the [FAA] far beyond Congress'[s] original intent. Many lower courts have relied on this 'national policy' to effectively eliminate any review of arbitration agreements under state laws of unconscionability. As a result, the Supreme Court has unwittingly encouraged companies to employ arbitration clauses in consumer contracts as a method of depriving consumers of certain types of relief. Banks, phone companies, and other large consumer businesses now use mandatory arbitration agreements to immunize themselves from class actions and classwide arbitration. As potential defendants, they hope that courts will rely on the Supreme Court's 'national policy' to uphold their arbitration agreements and force individual resolution of all consumer claims against them." T. Burch, *Necessity Never Made A Good Bargain: When Consumer Arbitration Agreements Prohibit Class Relief*, 31 Fla. St. U. L. Rev. 1005, 1039 (2004).

employee of the AAA. The affiant states that he reviewed a CSA prepared by AT&T, that its "Limitation of Liability" provision is a "substantial material deviation from AAA's Protocal [sic]," and that the AAA would not administer any arbitration pursuant to the CSA in question. Defendant then submitted a letter prepared by a different employee of the AAA dated October 29, 2002, which stated in part:

> "Under current AAA policy, the Association is prepared to administer consumer-related disputes filed pursuant [to] this arbitration agreement involving AT&T. The AAA's willingness to administer disputes under AT&T's arbitration agreement is contingent upon AT&T's continued willingness to have all past, present[,] and future consumer-related disputes administered in accordance with the Consumer Rules and the Protocol. The AAA reserves the right to decline administration in the future if AT&T deviates from the Consumer Rules and/or protocol."

As previously noted, the trial court did not conduct an evidentiary hearing and made no written findings to explain its ruling. As a result, we have no way of knowing whether this particular issue played any part in the court's ultimate ruling. We do know that the United States Supreme Court has addressed the issue of the enforceability of arbitration agreements that can be construed to limit an arbitrator's authority to award damages. In *PacifiCare Health Systems, Inc. v. Book*, 538 U.S. 401, 155 L. Ed. 2d 578, 123 S. Ct. 1531 (2003), the Court stated:

> "In short, since we do not know how the arbitrator will construe the remedial limitations, the questions whether they render the parties' agreements unenforceable and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract. As in *Vimar[ Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 132 L. Ed. 2d 462, 115 S. Ct. 2322 (1995)], the proper course is to compel arbitration." *PacifiCare Health Systems, Inc.*, 538 U.S. at 407, 155 L. Ed. 2d at 584, 123 S. Ct. at 1536.

Accordingly, it is for the arbitrator to construe the CSA and determine whether it impermissibly interferes with plaintiffs' state statutory rights. *Ciago v. Ameriquest Mortgage Co.*, 295 F. Supp. 2d 324, 333 (S.D.N.Y. 2003). If the AAA refuses to arbitrate this dispute because of the terms of the CSA, then the matter can be referred back to the trial court. We are staying this matter, not dismissing it.

## Fraudulent Scheme

■ Next, plaintiffs argue that defendant used the arbitration provision to further its fraudulent scheme and insulate itself from judicial scrutiny. Plaintiffs argue that this issue is controlled by *Moseley v. Electronic & Missile Facilities, Inc.*, 374 U.S. 167, 10 L. Ed. 2d 818, 83 S. Ct. 1815 (1963). *Moseley* stands for the proposition that an allega-

tion that an arbitration agreement was fraudulently entered into raises an issue of the validity of the arbitration clause, which must be resolved by a court. See also *In re Arbitration Between Teleserve Systems, Inc. & MCI Telecommunications Corp.*, 230 A.D.2d 585, 592, 659 N.Y.S.2d 659, 664 (1997) ("under either Federal or New York law, to the extent that petitioner challenges the arbitration clauses themselves or their inclusion in the agreements, those challenges are for the court to determine").

In this case, we find that plaintiffs' allegation of a fraudulent scheme goes to the contract as a whole and not simply the arbitration clause. See *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967) (the United States Supreme Court held that a challenge to the entire agreement and not just the arbitration provision is for the arbitrator to decide). It is not enough to allege that the arbitration clause was inserted to further a fraudulent scheme. The question in all cases simply is *whether the agreement to arbitrate itself was induced by some fraud.* Ordinarily this means that there must be facts alleged from which it might be concluded that the party resisting arbitration never intended to agree to arbitrate the issues raised in the proceedings or that its assent to the agreement to arbitrate was the product of wrongful coercion. "Absent such an allegation it must be concluded that the parties agreed to arbitrate their differences, including issues of fraud in the inducement of the contract, and the matter should be referred to the arbitrators without any preliminary judicial consideration of the question of fraud in the inducement." *Hayes Children Leasing Co. v. NCR Corp.*, 37 Cal. App. 4th 775, 781, 43 Cal. Rptr. 2d 650, 654 (1995). Thus, *Moseley* is not controlling.

This case is also distinguishable from our decisions in *Travis v. American Manufacturers Mutual Insurance Co.*, 335 Ill. App. 3d 1171, 782 N.E.2d 322 (2002), *Hanke v. American International South Insurance Co.*, 335 Ill. App. 3d 1164, 782 N.E.2d 328 (2002), and *Austin v. Illinois Farmers Insurance Co.* 351 Ill. App. 3d 931, 815 N.E.2d 435 (2004). In *Travis*, the plaintiff alleged a fraudulent scheme in that the defendant insurance company contracted with an outside company to provide biased, below-market estimates of total-loss-vehicle values. We concluded that these types of claims presented more than a disagreement between the parties concerning the actual cash value of the vehicle and that therefore the dispute was not covered by the appraisal clause of the insurance contract. *Travis*, 335 Ill. App. 3d at 1177, 782 N.E.2d at 327. In *Hanke*, the plaintiff alleged that as a part of the fraudulent scheme, the insurance company required all the parties to submit to an appraisal process if they could not agree on the

value of the loss. As in *Travis*, we found that the allegations of the complaint exceeded the scope of the appraisal clause. *Hanke*, 335 Ill. App. 3d at 1169, 782 N.E.2d at 332. And in *Austin*, the insured brought an action against the automobile insurer to recover for an allegedly fraudulent scheme to keep medical-payments claims to a certain percentage or amount by utilizing third-party reviewers. As in *Travis* and *Hanke*, we found that the allegations in the plaintiff's amended complaint went "far beyond the scope of the disagreements covered in the arbitration clause." *Austin*, 351 Ill. App. 3d at 940, 815 N.E.2d at 442.

In this case, the "Dispute Resolution" portion of the CSA is much broader and covers the allegations of plaintiffs' complaint. Paragraph 7(a) states:

> "**Binding Arbitration**. The arbitration process established by this section is governed by the [FAA], 9 U.S.C. §§ 1-16. You have the right to take any dispute that qualifies to small claims court rather than arbitration. All other disputes arising out of or related to this Agreement (whether based in contract, tort, statute, fraud, misrepresentation[,] or any other legal or equitable theory) must be resolved by final and binding arbitration."

As indicated, the parties have agreed to arbitrate their differences, including issues of fraud in the inducement of the contract, and the matter should be referred to the arbitrators without any preliminary judicial consideration of the question of fraud in the inducement.

### Prohibitively Expensive

■ Finally, plaintiffs contend that arbitration under the CSA is prohibitively expensive. Excessive fees have been grounds for finding an arbitration provision unenforceable or commercially unreasonable. See, *e.g., In re Arbitration Between Teleserve Systems, Inc. & MCI Telecommunications Corp.*, 230 A.D.2d at 593-94, 659 N.Y.S.2d at 664. A party opposing arbitration on the ground that arbitration would be excessively expensive bears the burden of demonstrating that he or she will likely incur prohibitive costs. *Zobrist v. Verizon Wireless*, 354 Ill. App. 3d 1139, 1146 (2004). Paragraph 7(c) of the CSA provides:

> "**Fees and Expenses of Arbitration**. You must pay the applicable AAA filing fee when you submit your written request for arbitration to the AAA. The AAA's filing fee and administrative expenses for a document arbitration will be allocated according to the AAA's Rules, except that for claims of less than $1,000, you will only be obligated to pay a filing fee of $20 and we will pay all of the AAA's other costs and fees. If you elect an arbitration process other than a document (or 'desk') arbitration, you must pay your allocated share of any higher administrative fees and costs for the

process you select. Unless applicable substantive law provides otherwise, each party will pay its own expenses to participate in the arbitration, including attorneys' fees and expenses for witnesses, document production, and presentation of evidence. The prevailing party may, however, seek to recover the AAA's fees and the expenses of the arbitrator from the other party."

According to the terms of the CSA, plaintiffs will pay a $20 filing fee, and defendant will pay the remaining costs related to a desk arbitration.[2] If plaintiffs elected an arbitration process other than a desk arbitration, the costs to plaintiffs for arbitration will be limited by the cap to be applied by the AAA.[3] The fees described in the CSA and in the AAA's rules are not unreasonable. See *Green Tree Financial*

---

[2]"In a 'Desk' Arbitration, the parties submit their arguments and evidence to the arbitrator in writing. The arbitrator then makes an award based only on the documents. No hearing is held." Am. Arbitration Ass'n, Supplementary Procedures for Consumer-Related Disputes, Glossary of Terms, eff. July 1, 2003.

[3]"**Fees and Deposits to be Paid by the Consumer:**

If the consumer's claim or counterclaim does not exceed $10,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $125. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim is greater than $10,000, but does not exceed $75,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $375. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim exceeds $75,000, or if the consumer's claim or counterclaim is non[ ]monetary, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule. A portion of this fee is refundable pursuant to the Commercial Fee Schedule. The consumer must also deposit one-half of the arbitrator's compensation. This deposit is used to pay the arbitrator. This deposit is refunded if not used. The arbitrator's compensation rate is set forth on the panel biography provided to the parties when the arbitrator is appointed.

**Fees and Deposits to be Paid by the Business:**

*Administrative Fees*:

If neither party's claim or counterclaim exceeds $10,000, the business must pay $500 and a Case Service Fee of $200 if a hearing is held. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

If either party's claim or counterclaim exceeds $10,000, but does not exceed $75,000, the business must pay $750 and a Case Service Fee of $300 if a hearing is held. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

If the business's claim or counterclaim exceeds $75,000 or if the business's claim or counterclaim is non[ ]monetary, the business must pay an Administra-

*Corp.—Alabama v. Randolph,* 531 U.S. 79, 95, 148 L. Ed. 2d 373, 386, 121 S. Ct. 513, 524 (2000). Regarding attorney fees, defendant acknowledges in its brief that plaintiffs can be awarded attorney fees by the arbitrator. See also 815 ILCS 505/10a(c) (West 2002) (the right to collect attorney fees under the Consumer Fraud and Deceptive Business Practices Act). In addition, plaintiffs have the right pursuant to the CSA and to the rules of the AAA to bring an action in small claims court or before the FCC. For these reasons, we conclude that the excessive-costs argument is insufficient to invalidate the arbitration agreement in this case.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Madison County, and pursuant to Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)), we hereby grant defendant's motion to compel arbitration and to stay the judicial proceedings in Madison County, Illinois.

Reversed; order entered.

HOPKINS and KUEHN, JJ., concur.

---

tive Fee in accordance with the Commercial Fee Schedule. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

*Arbitrator Fees*:

The business must pay for all arbitrator compensation deposits beyond those that are the responsibility of the consumer. These deposits are refunded if not used.

If a party fails to pay its fees and share of the administrative fee or the arbitrator compensation deposit, the other party may advance such funds. The arbitrator may assess these costs in the award." Am. Arbitration Ass'n, Supplementary Rules for Consumer-Related Disputes, Administrative Fees and Arbitrator Fees, R. C—8, eff. July 1, 2003.