In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-3036

BRENT BAUER, *et al.*,

*Plaintiffs-Appellees*,

*v.*

QWEST COMMUNICATIONS COMPANY,
LLC, *et al.*,

*Defendants-Appellees*.

APPEAL OF: THE SUSMAN GROUP, *et al.*,

*Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 1008 — **Rebecca R. Pallmeyer**, *Judge*.

ARGUED FEBRUARY 25, 2013 — DECIDED FEBRUARY 14, 2014

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. More than 13 years ago, trial lawyers around the country began challenging the installation of fiber-optic cable on landowners' property without consent. After protracted class-action litigation in many states, these challenges began to settle on a state-by-state basis, leaving a platoon of lawyers to sort out the allocation of awarded and expected attorney's fees between themselves.

The lawyers have informally grouped themselves into three factions for purposes of the present fee-allocation dispute; the groupings are based on the lawyers' negotiation and litigation positions. This appeal requires us to determine whether the lawyers have successfully reached a global settlement of the fee-division dispute through mediation—more specifically, whether the faction consisting of Arthur Susman on behalf of himself and his colleagues (a/k/a The Susman Group, hereinafter "Susman") is bound by a written agreement memorializing the mediated final fee allocation that all the lawyers had previously approved. The catch: Although Susman had agreed to the fee division, he balked at signing the written agreement, ostensibly because he disliked its enforcement terms. The district court held that Susman is bound by the agreement despite his failure to sign, and Susman appealed.

We affirm. Based on the parties' lengthy course of dealing, the district court found that Susman's failure to promptly object to the written agreement can objectively be construed as assent. The court also found that Susman's eventual refusal to sign was a case of "buyer's remorse" rather than a genuine objection to the enforcement terms in the agreement. These

findings are supported by the record; we find no factual or legal error.

## I. Background

This litigation has a very long history, but the story for our purposes begins on August 29, 2011, when the district court approved an Illinois class settlement in the underlying fiber-optics cable litigation and awarded attorney's fees and expenses. The award was deposited into an escrow account, and the attorneys agreed to pursue mediation—with the assistance of a court-appointed special master if necessary—to reach a division of the fees for the Illinois settlement and for other settlements nationwide. Once the fee-division question was resolved, the court would order the disbursement of the funds held in escrow.

The plaintiffs' lawyers had coalesced into three main groups for purposes of the fee dispute: Susman (the appellant here); the "48-Firm Group" (the appellees here, consisting of a coalition of 48 law firms); and William Gotfryd (a former collaborator with Susman who later asked to be treated separately in the fee-division process, also an appellee here). The first attempt to resolve the fee-division issue occurred back in 2006 when all the lawyers except Susman and Gotfryd agreed to submit the issue of attorney's fees to binding arbitration at a future time. This resulted in a 2011 proposal binding on the 48-Firm Group as to the fee allocation within that group, but this proposal did not address Gotfryd and Susman and did not bind them. The parties continued to attempt to resolve the situation through mediation after the

district court so ordered, but a global agreement was not readily forthcoming.

On June 11, 2012, the mediators made one "final effort" to resolve the dispute and have the "entire fee fight settled." They offered a final "Mediators' Proposal" awarding each lawyer or group of lawyers a certain percentage of the national gross fees.[1] The proposal was "blind," in the sense that each firm received an email listing only the percentage of the fee allocation that it would receive. After a long history of disagreement, the mediators recognized that the prospects for agreement would likely be improved if the parties were only offered a chance to think about their absolute—rather than relative—awards. The proposal was a take-it-or-leave-it offer, meaning that each party could only respond "Accept" or "Reject"—no more negotiation. As it turned out, the proposal allocated 87% of the fees to the 48-Firm Group, 8.5% to Gotfryd, and 4.5% to Susman. The proposal contained only the fee-division percentages and a condition that the percentages were subject to a pro rata reduction for an arbitrated award to a fourth attorney, Seth Litman, to be determined after the agreement was finalized.

Everyone accepted the proposal. When the present dispute later arose, Gotfryd and various members of the 48-Firm Group submitted declarations to the district court explaining that they had accepted the mediators' proposal despite having

---

[1] "Gross fees" was later defined in the written agreement as encompassing both attorney's fees and expenses, and neither party has challenged that definition. We therefore assume that the mediators' proposal was to cover both fees and expenses.

misgivings about it because they valued the peace and finality it would bring. One member of the 48-Firm Group stated that he

> agreed to accept the mediators' proposal for the sole reason that it was the only way to prevent what would have been even more wasted time and additional cost to undertake fee litigation. The elimination of the threat of any such litigation was always presumed to be part of the mediators' proposal.

Another lawyer—the one who drafted the written agreement—told the court that

> [e]limination of all future litigation was the controlling reason that the 48-Firm Group agreed to surrender several percentage points (more than two million dollars in value) from the allocation that we believe we would have received had we litigated the allocation. Based on the allocations in the original arbitration award, the nationwide scope of the [m]ediators' proposal, and the level of sophistication of the parties to the [agreement], it could not have been reasonable for any party to think that allocation issues between the 48-Firm Group and the other parties were not final and fully resolved.

A third lawyer wrote: "[I]n the end, I voted for peace, even at an unjustified premium. … The whole point of paying a premium was to get rid of the threat of litigating fees with Mr. Gotfryd or Mr. Susman — or anyone else from their

camp." Finally, Gotfryd said that the percentage award he was offered "was not completely unreasonable if it eliminated risk and achieved a final peace among all the counsel. It was with the promise of finality and peace that I accepted the mediators' proposal for my individual award."

After each party accepted the proposal, the mediators notified everyone that an agreement had been reached and scheduled a follow-up conference call. During that call, the parties recognized the need to memorialize the agreement in a formal writing, and a representative of the 48-Firm Group was tasked with drafting the document. The parties contemplated a quick drafting and approval process, apparently expecting that the written agreement would not generate major objections given that the heart of the dispute and the most divisive issue—the fee allocation—was now settled.

On July 2 a draft written agreement was circulated via email. It included the approved fee-division terms and several additional enforcement-related provisions. As relevant here, the written agreement provided that the mediators, now working in the capacity of arbitrators, were authorized to (1) arbitrate any disputes arising out of or relating to the agreement; (2) deem any lawyer's fees "forfeit[ed]" if the lawyer failed to cooperate in implementing the agreement in the state-specific settlements; and (3) adjust normal arbitration rules to further the goal of expediency.

The process of revising and approving the agreement moved quickly and, for the most part, uncontroversially. One of the mediators responded right away urging the lawyers to "get it all signed up today" if possible. Within two hours of the

initial circulation, Susman responded with a suggestion that two minor points be clarified; the changes were made immediately. Other adjustments were made pursuant to comments from the other parties. For example, one lawyer suggested the addition of a provision stating that the parties would hold one another harmless for any claim for fees or expenses by any other attorneys. A hold-harmless provision was added in a revised draft circulated on July 2.

The July 4th holiday then intervened. On July 5 the 48-Firm Group circulated a "final" revised draft with the following note (emphasis in original):

> **I hope the attached draft represents our final agreement and is appropriate for signatures.**
>
> … .
>
> I don't presume that silence since early afternoon Tuesday through the July 4th holiday and today means that each of you assents to the attached draft, but I hope so. We need to get this done, and I would like to circulate a draft for signatures. **Please let me know if you disagree. Otherwise, please consider the attached draft as the final draft for signature, and return your signed, signature page.** If additional changes are suggested, I will circulate them and, if necessary, we will work on another draft.

Susman did not respond with any further suggestions or disagreements. Comments from other lawyers produced a few more minor revisions, and another "final" draft was circulated

on July 6. After that point no further objections or suggestions were forthcoming, and the lawyers began to sign the agreement. Most signed and returned the July 6 draft immediately. A few others signed on July 9 and 10. The last (except for Susman) signed on July 12.

On July 11 the lawyer in charge of the drafting process emailed Susman reminding him to sign. Susman emailed back on the 12th saying that he was "not now in position to sign up" and needed to deal with "some loose ends on our part." The lawyers and mediators later learned that the "loose ends" referred to an expense dispute between Susman and Gotfryd. Susman cryptically told the drafting lawyer that the timing of his signature was "not in my hands," and the drafter passed that information along to the mediators.

On July 13 one of the mediators then emailed Susman asking him to "help us dot all the 'i's' and cross all the 't's' by signing this last agreement" and suggesting that he defer resolution of any remaining issues he had "on the side." He reminded Susman that the Litman fee issue was deferred for future arbitration and also noted that the agreement could be finalized with or without Susman's signature.

July 13 was a Friday. Susman waited until Tuesday, July 17, to respond to the mediator's email. He acknowledged his prior approval of the fee-allocation proposal but said he could not approve the written agreement because of an ongoing disagreement with Gotfryd and because "there are obligations in the proposed Agreement which were really not a part of the original mediators' proposal and which were not part of our understanding of our acceptance" of that proposal. He

repeated this position in a phone call with the court-appointed special master on July 19.

The Litman arbitration was completed on July 19. On July 20 the lawyers filed a motion asking the district court to hold that Susman is bound by the written agreement notwithstanding his failure to sign and to order the distribution of their agreed-upon percentages from the settlement escrow. They submitted evidence about the unanimous approval of the mediators' fee-division proposal and the circumstances surrounding the drafting and approval process that had produced the final written agreement. After hearing argument, the district court granted the motion.

First, the judge identified several objective circumstances that supported a finding of Susman's assent to be bound: (1) Susman agreed to the mediators' fee-allocation proposal; (2) every lawyer knew that the agreement would need to be reduced to writing; (3) Susman had no objections to the initial draft aside from two minor suggestions that were immediately addressed and were unrelated to his current objections; and (4) Susman lodged no objection to the subsequent drafts, which came in quick succession until the final version of the agreement was circulated on July 6. The judge also noted that the other lawyers had signed the final agreement in reliance on Susman's silence, which they could reasonably interpret as a lack of objection. Importantly, the judge found that Susman's conduct and his comments at oral argument suggested that he had a case of "buyer's remorse." Apparently dissatisfied that Godfryd was getting a larger fee allocation, Susman objected

to the enforcement provisions in a last-ditch attempt to "escape from a fee distribution to which he is admittedly bound."

Based on these findings, the judge held that Susman is bound by the final written agreement and entered an order disbursing the escrow funds to the various attorney groups according to the percentages in the agreement. Susman appealed, and while his appeal has been pending, fee-allocation orders have been entered and fees distributed in several other state settlements in accordance with the agreement. Susman has not objected to the distributions but continues to maintain that he is not bound by the written agreement.

## II. Analysis

On appeal Susman acknowledges that he approved the mediators' fee-allocation proposal but insists that he never agreed to the additional terms that appeared in the final written agreement. More specifically, he objects to the hold-harmless clause and the enforcement provisions empowering the mediators to arbitrate future disputes and "forfeit" the fees of attorneys who do not cooperate in implementing the agreement in state-by-state settlements. Susman relies heavily on the fact that he did not sign the agreement.[2] Illinois contract law applies. *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385,

---

[2] Relatedly, Susman also invokes the statute of frauds, but this argument was not raised in the district court and is therefore waived. *See Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010).

387 (7th Cir. 1999); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997).

"Under Illinois contract law, a binding agreement requires a meeting of the minds or mutual assent as to all material terms." *Abbott Labs.*, 164 F.3d at 387; *see also Schafer v. UnionBank/Cent.*, 973 N.E.2d 449, 457 (Ill. App. Ct. 2012). "Whether the parties had a 'meeting of the minds' is determined not by their actual subjective intent," *Abbott Labs.*, 164 F.3d at 387, but rather based an "objective theory of intent," *Newkirk v. Village of Steger*, 536 F.3d 771, 774 (7th Cir. 2008). *See also Urban Sites of Chi., LLC v. Crown Castle USA*, 979 N.E.2d 480, 496 (Ill. App. Ct. 2012) ("[A]n enforceable contract must include a meeting of the minds or mutual assent as to the terms of the contract. … Generally, it is the objective manifestation of intent that controls whether a contract has been formed. … The subjective understanding of the parties is not required in order for there to be a meeting of the minds."). To determine whether a party assented, the court "look[s] first to the written records, not to mental processes." *Newkirk*, 536 F.3d at 774.

Whether a contract was formed is a question of law subject to plenary review, but we review the district court's subsidiary factual findings deferentially for clear error. *See, e.g., Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005) (explaining that review of the district court's conclusion that the parties had agreed to arbitrate was "plenary," but "insofar as the district court's decision rests on findings of fact, … we use the clearly erroneous standard" (alterations and internal quotation marks omitted)); *Thomas v. Gen. Motors Acceptance*

*Corp.*, 288 F.3d 305, 307 (7th Cir. 2002) (explaining that the clear-error standard governs mixed questions of law and fact). The district court is in a superior position to sift and weigh the evidence and as the factfinder is entitled to draw all reasonable inferences that are supported by the record. *See Coplay Cement Co. v. Willis & Paul Grp.*, 983 F.2d 1435, 1438–39 (7th Cir. 1993) ("When the judicial task is to infer meaning from disparate bits of evidence, some textual, some testimonial, none contested in themselves but the aggregate forming a confused mosaic, it is a task more appropriate for a trier of fact than for a declarer of legal rules."). The critical question here is a factual one: Did Susman objectively manifest assent to be bound even though he did not sign the agreement? The district court answered that question "yes," and we review that determination deferentially.

"Generally, one of the acts forming the execution of a written contract is its signing. Nevertheless, 'a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it.' " *Carlton at the Lake, Inc. v. Barber*, 928 N.E.2d 1266, 1270 (Ill. Ct. App. 2010) (citation omitted) (quoting *Landmark Props., Inc. v. Architects Int'l–Chi.*, 526 N.E.2d 603, 606 (Ill. 1988)). Silence reasonably may be interpreted as acceptance of a contract in certain limited circumstances. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *see also First Nat'l Bank of Chi. v. Atl. Tele-Network Co.*, 946 F.2d 516, 519 (7th Cir. 1991) ("The law ordinarily treats silence as rejection, not acceptance, of an offer … . But that is in general, not in every case. If circumstances make it reasonable (ordinarily on the

basis of previous dealings with the offeree) for the offeror to construe silence as acceptance, he may do so.").

Silence may be construed as acceptance where "because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." RESTATEMENT (SECOND) OF CONTRACTS § 69(1)(c) (1981); *see also Ragan v. AT&T Corp.*, 824 N.E.2d 1183, 1188 (Ill. Ct. App. 2005). In this situation, "the offeree's silence is acceptance, regardless of his actual intent, unless both parties understand that no acceptance is intended." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. d (1981).

The district court found that under the circumstances here, Susman's silence should be interpreted as assent to the written agreement. That was a reasonable determination. The parties had worked on the fiber-optic-cable class actions for more than a decade, whether as cocounsel or in clear awareness of the parallel litigation activity in multiple states. They had recently worked out a system for settling the litigation on a state-by-state basis, and they were close to the end of a long and contentious fight over fees. Susman in particular had been a holdout on that front, having rejected the 2006 fee-arbitration agreement; he admits that he had a history of promptly speaking up when he found something objectionable. True to form, in this case Susman raised two minor points to the initial draft of the agreement within hours of its circulation. His suggestions were immediately addressed and incorporated into a subsequent draft. Tellingly, he did *not* object to any of the terms he now complains of; the arbitration provisions were present in the initial draft, and the hold-harmless clause was

added the very next day. As to these terms, he remained silent for two weeks.

By this time the lawyers were a sort of community of interest, working together toward a final resolution of the fee dispute and an end to the litigation. They accepted the mediators' fee-division proposal with the understanding that it was a final effort to get "the entire fee fight settled" once and for all—to achieve "global peace," as Gotfryd put it at oral argument. The declarations submitted to the district court by Gotfryd and various members of the 48-Firm Group indicate that they accepted the mediators' proposal largely because they understood it to put an end to uncertainty and bring about an expeditious distribution of attorney's fees with no further threat of litigation. Indeed, it's hard to imagine that their acceptance of the fee-allocation proposal could be understood in any other way. The unanimous approval of the mediators' proposal included the agreed-upon division of fees but also plainly contemplated an enforcement mechanism that would foreclose future litigation.

Consistent with this understanding, the written agreement provided for enforcement by arbitration if necessary. Needless to say, alternative dispute resolution is commonplace in this context, and under the particular circumstances here, the arbitration provisions could not have been unexpected. As the district court noted, it would be "remarkable … that you would work out this kind of arrangement and it wouldn't include some kind of arbitration or other dispute resolution mechanism in light of the fact that there are several other states that are out there." Again, the whole point was to secure

"global peace" in the fight over fees. *Cf. First Nat'l Bank of Chi.*, 946 F.2d at 519 (explaining that a condition was "so plainly reasonable given its essentiality" to the appellee's security that "we have trouble understanding how [the appellant] could have defended a refusal to accept it" and that "[t]his would be an additional reason why the [appellee] could presume that it *had* been accepted in the absence of an explicit rejection").

Susman's past hostility toward arbitration isn't incongruous with construing his silence as a lack of objection rather than a lack of assent. His previous rejection of arbitration pertained to the substantive fee-division issue, but that issue was now resolved. The arbitration provisions he now finds objectionable cover future disagreements that may arise in the implementation of the fee-allocation agreement. Susman cannot rely on his past objection to arbitration to explain his two-week silence in the face of a sense of urgency and a need for repose that was known to all. The parties had settled their substantive dispute, and the written agreement memorializing that settlement unsurprisingly contained an enforcement mechanism ensuring that the implementation would proceed without the threat of litigation. In short, it was reasonable for the other lawyers to expect Susman to promptly raise his objections to the written agreement and to construe his two-week silence as assent.

If more evidence were needed, the July 5 email put Susman on notice that he was expected to speak up—and soon—if he had any objections to the draft agreement. Yet despite the boldface exhortation to "**[p]lease let me know if you disagree**" and "**[o]therwise, please consider the attached draft as the final draft for signature**," Susman still maintained his silence.

Thereafter everyone but Susman signed quickly, in the reasonable assumption that no further objections were forthcoming and the written agreement was now in its final form.

We cannot ignore the fact that the parties' communications indicate an intention to require signatures (and indeed every other lawyer signed the agreement) and that Susman eventually did lodge an objection and explicitly refuse to sign. But the district court interpreted Susman's belated expression of disagreement not as a genuine objection to the additional terms but rather as an attempt to escape or reopen the substantive fee-division percentages, a tricky maneuver given his acknowledged acceptance of the mediators' proposal. The district court's inference is entirely reasonable and is adequately supported by the record; at the very least, it is not clearly erroneous.

Indeed, when pressed at oral argument, Susman identified the expense dispute with Gotfryd as the reason he objected to the written agreement. He also acknowledges on appeal that he considers himself bound by the fee-allocation percentages, and indeed he has been accepting distributions pursuant to the agreement. If his real complaint is the size of his share—whether in relative terms, once he saw all the numbers, or because the expense dispute with Gotfryd made him change his mind about the allocation's fairness—then his reliance on a tardy objection to the arbitration and hold-harmless provisions in the written agreement is hard to explain as anything other than a sham. He can't reopen the fee division now, and he claims he's not trying to; but neither can he get out of the other terms in the written agreement by way of a late objection

when the circumstances reasonably suggest that he manifested an assent to be bound.

The district court was intimately familiar with the parties' course of conduct during the fee dispute and carefully reviewed the evidence before finding that Susman is bound by the written agreement despite his failure to sign. Given the parties' lengthy relationship and course of dealings, the district court reasonably construed Susman's silence as an assent to be bound.

AFFIRMED.